**AMERICAN HOSPITAL ASSOCIATION,**
**Plaintiff,**

v.

**Otis R. BOWEN, et al., Defendants.**

**Civ. A. No. 85–0311.**

United States District Court,
District of Columbia.

May 30, 1986.

On Motion for Reconsideration
July 16, 1986.

456

Gregory M. Luce, F. Joseph Nealon, Miles & Stockbridge, Washington, D.C., for A.H.A.

Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., Leslie K. Dellon, Dept. of Justice, Civil Div., Washington, D.C., for Bowen, Secretary of Dept. of Health and Human Services.

### MEMORANDUM

BRYANT, Senior District Judge.

This case is before the court on defendant's motion to dismiss or in the alternative for summary judgment, and on plaintiff's cross-motion for summary judgment. For the reasons discussed below, both motions are granted in part and denied in part.

### I. *Background*

This case concerns the means by which the Department of Health and Human Services ("HHS") has implemented the Peer Review Improvement Act of 1982, 42 U.S.C. § 1320c *et seq.*, a critical element of the Medicare Program.

The Medicare Program provides for federal government reimbursement of medical expenses for those over sixty-five years of age, and for some of the disabled under sixty-five. Originally, Medicare reim-

bursed a hospital or other health care provider for the "reasonable cost" of providing medical services to Medicare beneficiaries. 42 U.S.C. §§ 1395b and 1395x(v). The Social Security Amendments of 1983 changed this reimbursement system to a Prospective Payment System ("PPS"). Hospital discharges now are classified under a list of Diagnosis Related Groups ("DRGs"), and Medicare expenses are paid prospectively to providers according to a predetermined rate based on the DRG, 42 U.S.C. § 1395ww.

To receive payment under PPS, hospitals must have an agreement with a Utilization and Quality Control Peer Review Organization ("PRO"). 42 U.S.C. § 1395cc(a)(1)(F). The PRO generally is responsible for reviewing a hospital's administration of the Medicare Program: it determines whether the services provided to Medicare beneficiaries are medically necessary and allowable under the program, whether the quality of care meets professionally recognized standards, and whether proposed in-hospital care could be provided more economically on an out-patient basis. 42 U.S.C. §§ 1320c–3(a)(1). The PRO also is responsible for determining, based on its review, whether Medicare shall make payment for medical services. 42 U.S.C. § 1320c–3(a)(2). The PRO determination of whether payment shall be made generally is conclusive. *Id.*

HHS is directed to designate geographic areas corresponding to each state, to be served by individual PROs. 42 U.S.C. § 1320c–2(a). HHS then must enter agreements, for an initial two-year term, with a PRO in each area. 42 U.S.C. § 1320c–2(b)(1) and (c)(3). HHS has considerable discretion in negotiating each of these contracts. It may negotiate different agreements with each PRO; it may make agreements without regard to any federal laws regarding contracts which it determines to be inconsistent with the PRO program. 42 U.S.C. § 1320c–2(e).

To qualify as a PRO an entity must be composed of a sufficient number of physicians practicing in the PRO area to carry out the requisite review functions. 42 U.S.C. § 1320c–1. The contract between the PRO and HHS must include negotiated objectives against which PROs will be judged and must contain negotiated specifications for use of regional norms, or modification of national norms, for performing review functions. 42 U.S.C. § 1320c–2(c)(7). The PRO must specify in its contract the types of cases it will review. 42 U.S.C. § 1320c–3(a)(4). HHS has entered into contracts with a PRO in each PRO area.

To participate in the Medicare program, hospitals must enter into agreements with the PRO in its area. The agreement between the hospital and the PRO must allow PROs to review the validity of diagnostic information provided by the hospital, to review the completeness, adequacy and quality of care provided, to review the appropriateness of hospital admissions, and to review the appropriateness of care provided for which extra Medicare payments are sought. 42 U.S.C. § 1395cc(a)(1)(F). Hospitals were required to enter into such agreements by November 15, 1984. Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 2347(b).

Congress empowered HHS to promulgate regulations governing PROs in order to implement the PRO program. 42 U.S.C. § 1320c–3(a)(8). The Act provides few specifics regarding how the PRO is to conduct its business on a day-to-day basis, and by empowering HHS to promulgate regulations, Congress evidently envisioned HHS creating the myriad procedures necessary to administer the program. Prior to the filing of the complaint in this action, HHS promulgated several regulations pertaining to the PRO program. *See* 42 C.F.R. §§ 412.42; 412.44; 412.46; 412.48; 412.82; 462.100 *et seq.* These regulations haphazardly touch on an incomplete and disparate selection of PRO procedures, including basic PRO review functions, DRG validation; reporting hospital misrepresentations, and review of hospital determinations of noncoverage. The parties agree these regulations were promulgated as required by The

Administrative Procedure Act, 5 U.S.C. § 553.

Besides these regulations, HHS issued a varied series of communications governing the PRO program, including PSRO Transmittals No. 107 and 108, Medicare Hospital Manual Transmittal No. 367 and Medicare Intermediary Transmittal No. 1079, Medicare Intermediary Transmittal No. 1102, and PRO Program Directive No. 2. These communications contain a wide variety of instructions, guidelines and procedures covering aspects of the PRO program. Other procedures concerning the PRO program are found in the Request for Proposals ("RFP") issued by HHS. This document solicited proposed contracts from entities seeking to become PROs, and it instructed them as to what review procedures the contracts must address, and what provisions they must contain. The contracts ultimately entered into between HHS and the PROs contain the provisions the RFP required.

The parties agree that none of the documents mentioned above were issued pursuant to the notice and comment procedures of the A.P.A.

The plaintiff in this action, The American Hospital Association ("AHA") is an Illinois non-stock corporation, representing six thousand member hospitals. On October 10, 1984, faced with the small, incomplete selection of regulations HHS had published implementing the PRO program and the large number of procedures proscribed in documents not published as regulations, AHA filed with HHS a petition for rulemaking, pursuant to 5 U.S.C. § 553(e). In it AHA requested HHS to promulgate a complete set of regulations governing all aspects of the PRO program.

On December 14, 1984, the then Secretary of HHS, Margaret Heckler, wrote a letter to AHA's general counsel stating that her staff was preparing a response to the petition, but would be unable to respond within the sixty-day period requested by AHA.

AHA sent another letter on January 8, 1985, requesting a date for HHS's response. No response to this letter was ever received.

On January 29, 1985, AHA commenced this action. The essence of its complaint is that HHS implemented large areas of the PRO program through the communications listed above at p. 4, thus circumventing the notice and comment requirements of the A.P.A., 5 U.S.C. § 553. They request, *inter alia*, that this court declare the documents invalid for failure to comply with § 553, and that this court order HHS to promulgate all regulations implementing the PRO program in accordance with notice and comment procedures.

AHA also complains that HHS's denial of the petition for rulemaking is arbitrary and capricious and an abuse of discretion. They seek an order compelling HHS to grant the petition.

Prior to the time AHA filed its complaint, HHS had published four notices of proposed rulemaking pertaining to the PRO program. On April 17, 1985, after the complaint was filed, the four sets of final regulations were published in the Federal Register at 50 Fed.Reg. 15,312; 15,335; 15,347; and 15,364.

The first set of regulations govern PRO review functions generally. They also explain the relationship between the PRO and fiscal intermediaries, hospitals, physicians and patients.

The second set concern PRO determinations of violations of Medicare procedures by physicians, hospitals and beneficiaries. They state the procedures the PRO is to follow after finding a violation and the sanctions which may be imposed. They also discuss appeal procedures by which an imposition of sanctions may be challenged.

The third set of regulations govern the acquisition, protection and disclosure of information used by the PRO. The regulations implement the PRO's right of access to hospital records and establish their responsibilities to assure the information is safeguarded.

The final set provides rules for reconsiderations and appeals of PRO determinations that services are not covered by Medicare. They also cover procedures for reviewing PRO changes in DRG assignments.

Also after the complaint was filed, on May 2, 1985, HHS sent AHA its response and denial to the petition for rulemaking.

HHS has filed a motion to dismiss or in the alternative for summary judgment. AHA opposes the motion and has filed its own cross-motion for summary judgment.

## II. *Discussion*

AHA charges that HHS has implemented aspects of the PRO program through various communications rather than through publishing regulations, illicitly circumventing the APA's notice and comment procedures. They claim these communications are invalid for failure to comply with the APA. HHS raises two responses. First, it claims the four sets of regulations published subsequent to the filing of the complaint establish procedures governing every phase of the PRO program and that therefore the complaint is moot. Second, it claims that the various challenged communications are only interpretive rules, which the A.P.A. excepts from the notice and comment requirements. The communications are valid, they argue, even though they admittedly were not issued in accordance with the A.P.A.

### A. *Mootness*

To determine whether the complaint is moot, we must analyse each communication to discern whether the rules it contains have been superseded by the new regulations published subsequent to the communications. If so, then the rule is binding on PROs and hospitals by virtue of the validly published regulation, rather than by authority of the communication, and there is no controversy regarding the validity of the communication. The new regulations will have "irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). If,

however, the communications contain rules which are not superseded by the new regulations, and which remain binding on PROs and hospitals, then the controversy remains live and the complaint is not moot.

### B. *Legislative and Interpretive Rules*

To determine whether the communications are legislative or interpretive rules, we must analyse each communication with reference to the relevant statutes and regulations issued prior to the communication.

■ Interpretive rules specifically are excepted from the notice and comment procedures of the A.P.A. 5 U.S.C. § 553(b)(A). The test to determine whether a rule is interpretive or whether it is legislative and subject to notice and comment procedures is found in *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C.Cir.1952):

> Legislative rules are those which create law, usually implementary to an existing law; whereas interpretive rules are statements as to what the administrative officer thinks the statute or regulation means.

Quoted in *Cabais v. Egger*, 690 F.2d 234, 238 (D.C.Cir.1982). The exception the A.P.A. provides is limited to situations where the agency merely is announcing its interpretation of a statute and stating how it believes the statute should be enforced. *Joseph v. U.S. Civil Service Commission*, 554 F.2d 1140, 1153 (D.C.Cir.1977); *Pesikoff v. Secretary of Labor*, 501 F.2d 757, 763 (D.C.Cir.), *cert. denied*, 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974).

> As the word interpretive suggests, and as the legislative history makes clear, interpretive rules consist of administrative construction of a statutory provision on a question of law reviewable in the courts.

*Pickus v. U.S. Board of Parole*, 507 F.2d 1107, 1113 (D.C.Cir.1974).

■ An interpretive rule generally is grounded firmly in the language of the statute or regulation it purports to interpret. It will contain, "reasoned statutory interpretation with reference to the lan-

guage, purpose and legislative history," of the relevant provision. *General Motors Co. v. Ruckelshaus,* 742 F.2d 1561, 1565 (D.C.Cir.1984). It imposes no original obligations designed to implement a statute. At most, an interpretive rule may repeat or emphasize an obligation already existing in a statute. *Id.* But when the rule departs from reasoned references to a statute and creates new procedures or duties, which are intended to implement a statute and conclusively affect the rights of interested parties, the rule is legislative. *Batterton v. Marshall,* 648 F.2d 694, 702 (D.C.Cir. 1980). Therefore, we must examine each communication to see if it only contains explanations of how HHS interprets a statute or regulation, or if it imposes a new procedure or obligation which is not directly derived from the language of a statute or regulation.

For example, in *Citizens to Save Spencer County v. U.S. Environmental Protection Agency,* 600 F.2d 844 (D.C.Cir.1979), our court of appeals considered the status of three rules issued by the E.P.A. without notice and comment. These rules implemented the 1977 amendments of the Clean Air Act, and contained an inconsistency: section 165 required that certain preconstruction review requirements were to come into effect by August 7, 1977, but section 168 indicated that these review requirements did not come into effect until after January 1, 1977.

E.P.A. issued the three rules to harmonize these inconsistent provisions. The first implemented section 168 as drafted, meaning that the review requirements would not become effective until after the section 165 date. But the court of appeals labeled this decision not to implement section 165 a "classic example" of an interpretive rule.

> Such a legal assessment of instructions of Congress, even if reaching the conclusion that these instructions are inconsistent and cannot be implemented without administrative harmonization, cannot itself be termed "legislative"; for EPA's assessment in this case created no new law, but merely followed Congress into the administrative abyss that Congress itself had created.

*Id.* at 877.

The first rule was interpretive because it implemented one provision of the statute over another in an evident attempt to make sense of inconsistent statutory direction. By contrast, the second and third rules unabashedly attempted an original compromise between the inconsistent provisions. They implemented the preconstruction review requirements on a third date not provided in the statute; a date seven months after the section 165 date and nine months before the section 168 date. These rules were legislative because they,

> were founded on no explicit provisions passed by Congress. Unlike the First Rule, which implemented other new ... requirements according to a schedule in undisputed conformity with the ... provision of § 168(b), the Second and Third Rules sought to fill a *breach* on the timing issue.... [B]y no stretch of the imagination could [they] have been derived by mere "interpretation" of the instructions of Congress.

*Id.*

■■■ Because the second and third rules created a new date, not explicitly provided by the statute, they were legislative. This was true even though the court stated that the new date was the best compromise available and even though it was within E.P.A.'s authority to make the new date. Thus it is beside the point that a rule may be consistent with the statutory scheme. A rule is legislative if it imposes a new obligation which fills in a procedural breach in the statute—if it implements aspects of a statutory program that the statute left out. An interpretive rule only reiterates or explains an explicit statutory obligation. When an agency exercises its rulemaking authority to create a new procedure, deadline, quota, or other binding obligation, which is not derived directly from explicit statutory language, then the rule is legislative, and subject to notice and comment procedures.

We now turn to each of the communications challenged by AHA in this action to determine, in light of the standards articulated above, whether they are legislative or interpretive rules. We also determine whether they are superseded by the new regulations, and have become moot.

### C. The Communications

#### 1. PSRO Transmittal No. 107

HHS argues preliminarily that the challenge to PSRO Transmittal No. 107 is moot because it has been superseded by a new communication, PRO Manual IM85–2. IM85–2 covers the same topics as its predecessor, incorporates many of the same procedures, elaborates on other procedures, and is, in general, a more organized and detailed version of Transmittal No. 107. Because it is essentially the same document as Transmittal No. 107, and because it also was not promulgated under notice and comment procedures, the issuance of IM85–2 raises the same legal question as the issuance of its predecessor, namely, whether IM85–2 contains legislative rules which implement aspects of the PRO program and which must be promulgated pursuant to the A.P.A. Therefore, we construe the complaint as attacking the validity of IM85–2.

IM85–2 defines many procedures governing the review functions of PROs. The statutes which deal with PRO review functions do so only in a general way, and conspicuously leave the procedural details to HHS rulemaking. 42 U.S.C. § 1395cc(a)(1)(F) provides that hospitals must maintain agreements with PROs which direct PROs to review diagnostic information, the completeness, adequacy and quality of care, and the appropriateness of admissions and care provided. *See also* § 1395ww(f)(2). 42 U.S.C. § 1320c–3(a)(1) defines the functions of the PRO to include reviewing the medical necessity of hospital admissions, reviewing the quality of care, and reviewing the appropriateness of in-patient hospital treatment. When the PRO determines, based on this review, that Medicare payment shall be denied, it must promptly notify the hospital, *id.* at (a)(7)(C) and (a)(9).

The regulations promulgated by HHS prior to the issuance of IM85–2 identify more specifically what types of review PROs must perform, but they still do not provide in significant detail what procedures the PROs are to follow. 42 C.F.R. § 412.44 provides that PROs are to review,

(a) the medical necessity, reasonableness and appropriateness of hospitals admissions and discharges,

(b) the medical necessity, reasonableness and appropriateness of inpatient hospital care for which additional payment is sought under the outlier provisions ...,

(c) the validity of hospitals diagnostic and procedural information,

(d) the completeness, adequacy and quality of services furnished in the hospital,

(e) other medical or other procedures with respect to beneficiaries or billing for services furnished to beneficiaries.

These regulations also provide that the PRO is to perform quarterly DRG validation, to verify the diagnostic and procedural coding used by the hospital for DRG assignment is substantiated by medical records. 42 C.F.R. § 412.46(c). If the review reveals the hospital information was incorrect, the PRO is to change the coding and assignment. 42 C.F.R. § 412.46(d). The PRO informs HHS when a hospital has misrepresented information or has taken an action resulting in unnecessary admissions or inappropriate medical services. 42 C.F.R. § 412.48.

The new regulations contain a similar though more detailed listing of PRO review functions than the old regulations. 42 C.F.R. § 466.70(c). They also provide for some specific procedures regarding how the PRO is to perform its review in relation to the hospital, including procedures for conducting DRG validation, §§ 466.84, 466.-85, 466.93, procedures for making payment determinations, § 466.86, and procedures governing notice of PRO denials of payment, §§ 466.94, 466.96.

IM85–2 is based, in a general way, on these statutes and regulations. It addresses itself to the types of review that the statutes and regulations specify, such as admissions review, outlier review (review of hospital stays which are longer or more costly than usual), and DRG validation. The document, however, provides a detailed description of how the PRO program shall be implemented which goes far beyond anything found in any other legislative source. Throughout its sixty-seven page length, IM85–2 establishes elaborate procedures, with specific requirements which govern PRO review. The procedures in the document are unmistakably absent from the statutes and regulations, and it is apparent that the document is HHS's fundamental source for implementing PRO review functions. It does not merely interpret or elucidate HHS's official position regarding statutes. Nor do the new regulations contain equivalent procedures. The document fills a breach left by the statutes and regulations.

The entire document is riddled with specific procedures implementing the PRO program which are not directly derived from any explicit statutory source; one set of examples must suffice.

Both the statute and the regulations provide that the PRO must review hospital admissions and discharges for appropriateness and medical necessity. IM85–2 addresses admissions review at 18 *et seq.* It specifies that the PRO must review at least 5% of all hospital admissions selected at random. *Id.* at 20. HHS may approve alternate review schedules, but these must include at a minimum 5% of all admissions and 2.5% of those must be selected at random. *Id.*

If a "significant pattern" of unnecessary admissions is noted for any quarter, the PRO is to step up review to include 100% of all admissions in the "subcategory" where the pattern was found. A subcategory is identified through an in-depth analysis by the PRO of the admissions review data. But if no subcategory can be identified, then the PRO must review 100% of all admissions for the hospital. A significant pattern triggering this intensified review occurs when 2.5% or three cases, whichever is greater, of hospital admissions have been determined to be unnecessary. *Id.*

Besides this random review, the document requires PROs to review all cases where a patient is transfered from a PPS hospital to any other acute care facility for medical necessity, appropriateness of admission, the reason for the transfer, and DRG validation of the record of the receiving hospital. *Id.* at 22.

All transfers from an acute hospital to a psychiatric unit which is a distinct part of an acute hospital and which is excepted from PPS must be identified by the PRO. Precise review requirements depend on which psychiatric diagnosis is involved and different requirements are provided in detail. Some listed diagnoses must be reviewed in every case; others are to be reviewed on a 10% basis, selected at random. When a significant pattern of unnecessary transfer admissions to exempt psychiatric units is found, intensified review is specified. *Id.* at 23.

All transfers to distinct part rehabilitation and alcohol/drug treatment units in PPS exempt facilities, and all transfers to swing bed reimbursement must be identified and reviewed by the PRO. Specific review criteria are provided. *Id.* at 25.

PROs must identify and review all cases involving admissions to any acute hospital within seven calendar days of discharge from a PPS acute facility. The type of review the PRO must perform is explained in detail. The document provides a formula by which the PRO must determine when intensified review is required. Separate instructions are given for review of hospitals outside the PRO jurisdiction. *Id.* at 28.

All admissions for permanent pacemaker insertions and reinsertions must be identified and reviewed by the PRO. And the PRO must identify and review all other invasive procedures where a pattern of abuse previously has been identified. *Id.* at 37.

These requirements and others like them throughout the document are not mere statements of what HHS thinks the statutes and regulations require. These are precise obligations which, while consistent with broad statutory directives, are not interpretations of any explicit statutory provisions. They establish frequency and method of review. These are "nuts-and-bolts" procedures which govern the daily business of PROs in their relationships to hospitals. These are original policy determinations which will have concrete effects on hospitals which must complete and produce records for PRO review within arbitrary time limits.

The language as well as the substance of the document reveals that HHS intended it to establish specific obligations which would provide a basis for denial of Medicare payments. The cover page introduction to the document states that it makes,

> revisions to the required review activities—some of which increase the level of review, while others decrease workload.

This statement is followed by a list of substantive changes in the review requirements. This hardly demonstrates that HHS was revising its interpretation of already existing obligations; rather, HHS clearly employed IM85–2 to make policy and implement the program. Further, the document is composed primarily of imperative language, which reads as if HHS is creating original obligations, rather than reiterating requirements found elsewhere. Indeed, in discussing the obligations upon hospitals and PROs, the document almost never even refers to the statutes or regulations which HHS claims it interprets.

▇ At issue here is not whether the procedures established in IM85–2 are valid exercises of HHS's rulemaking authority under the statutes; HHS is specifically authorized to make rules implementing the program. But it is apparent that HHS was exercising its rulemaking authority in issuing IM85–2—it imposed novel obligations implementing the PRO program. IM85–2 is a legislative rule. It is invalid for failure to comply with the notice and comment

procedures of the A.P.A. Also, because the specific review requirements implied that IM85–2 is not covered in the new regulations, the complaint as to this document is not moot.

## 2. *PSRO Transmittal No. 108*

HHS argues the challenge to PSRO Transmittal No. 108 is moot because it has been superseded by a new document, PRO Manual IM85–3. IM85–3 incorporates all of PSRO Transmittal No. 108 by reference, and covers the same areas of the PRO program as Transmittal No. 108. IM85–3 also was not issued pursuant to A.P.A. notice and comment procedures, and so raises the same legal issue as its predecessor, namely, whether it contains legislative rules implementing the PRO program, which are subject to notice and comment procedures. We therefore construe the complaint as challenging IM85–3.

IM85–3 addresses the PRO responsibility to review a determination by a hospital that a patient is no longer covered by Medicare and may be billed for services. 42 C.F.R. § 412.42(c) requires that when a hospital makes this determination, it must provide that patient written notice that,

1) the hospital and attending physician or the PRO conclude the patient no longer requires in-patient care;

2) charges will be made after the second day from the date of the notice;

3) the PRO will make a formal determination of the validity of the hospital finding if the beneficiary remains in the hospital after he or she becomes liable for charges;

4) the PRO decision is appealable; and

5) charges collected by the hospital will be refunded if a finding is made that the hospital's decision was improper.

Section 412.42(g) states that the PRO *may* review any case in which the hospital advises a patient that services are not covered by Medicare.

Many sections of IM85–3 are interpretive of § 412.42. It explicitly refers to that provision and repeats its requirement that

written notice is required. *See* cover page. The required elements of the written notice contained in the regulation are reiterated. IM85–3 at 63. It requires PROs to review notices given to patients who remain in the hospital and are billed for services, again reiterating an obligation imposed by the regulation. *Id.* at 69. The document states that the written notice may not mislead the patient or misstate the responsibility of the hospital, which is a logical inference for HHS to draw from the regulation. *Id.* at 64. And the "model notice" supplied with the document is nothing more than a graphic depiction of the notice which the regulation describes, and so is an interpretation.

■ IM85–3 departs from the text of the regulation, however, when it provides detailed procedures for reviewing denial notices other than those given to patients who are billed. Hospitals are directed to compile and maintain a monthly list of denial notices and to provide it to the PRO. *Id.* at 71. The PRO must select a random sample of at least 10% of the cases on the list, excluding all cases under review for any other reason. Of this random sample, the PRO must evaluate each case for the validity of the hospital's finding of non-coverage, and for medical necessity and appropriateness of admission. The PRO must request the records for the random sample within fifteen calendar days of receiving the monthly list, and the hospital must provide the medical records within thirty days of the request. The PRO must complete its review within fifteen days of receipt of the records. *Id.*

IM85–3 also requires that for every case which is under retrospective PPS medical review, as discussed in IM85–2, the PRO must examine the medical record to determine whether notice of non-coverage was given. *Id.* at 70. The PRO must determine whether the notice was placed on the hospital's monthly list and determine the validity of the hospital's non-coverage determination. This review is subject to the PPS review timeframes provides in IM85–2.

These review requirements, which are all contained in Section III of the document, create procedures governing PROs and hospitals which are not found in the regulation and which are not interpretations of any explicit provisions in them. The document establishes a frequency and method of review which is intended to be a binding obligation on PROs and hospitals, and which provide the basis for imposing sanctions on hospitals. These are legislative rules and IM85–3 is invalid for failure to comply with A.P.A. notice and comment procedures.

3. *Medicare Hospital Manual Transmittal No. 367, § 287.4A; and Medicare Intermediary Manual Transmittal No. 1079, § 3789c*

■ These documents provide a classic example of an interpretive rule and stand in sharp contrast to the legislative rules contained in IM85–2 and IM85–3.

Transmittal Nos. 367 and 1079 both state that a hospital or other health care provider may not represent a medicare beneficiary when that beneficiary appeals from a PRO determination that his medical services are not covered by Medicare. In so stating, both documents specifically refer to the Social Security Act, § 1879(d), 42 U.S.C. § 1395pp(d), which provides that a health care provider may only appeal from a determination that services are not covered by Medicare where HHS has first determined that the beneficiary will not exercise his right of appeal. After referring to this provision, the documents state that,

[a]llowing a provider to represent beneficiaries whose claims have been denied would permit a new and alternative avenue of provider appeals rights clearly not authorized under § 1879 and not in accordance with Congressional intent.

No. 1079 at 3–262; No. 367 at 48b1.

HHS is using these documents to announce its view that it would be inconsistent with the statutory scheme of § 1879 to allow providers to represent beneficiaries. This represents a reasonable interpretation of an explicit statutory provision.

Transmittal No. 1079 also refers to 42 C.F.R. § 405.201(c), which governs who may act as a beneficiary's representative in an appeal from a non-coverage determination. This regulation, by reference to 20 C.F.R. § subpart R, provides that a representative must be capable of giving valuable help to the beneficiary in connection with his claim. The document states that where a provider represents a beneficiary, a serious conflict of interest may arise, because

[a] provider may be more interested in protecting its favorable waiver of liability presumption or appealing a coverage determination than in impartially representing the beneficiary.

No. 1079 at 3–262.14.

HHS is announcing that it interprets § 405.201(c) to prohibit providers representing beneficiaries, because in its view their interests may conflict, and providers therefore cannot give beneficiaries valuable help. This is a reasonable interpretation of the regulation, and it is grounded firmly and explicitly in the language of the regulation. The document provides HHS's view of how the regulation applies to a concrete factual situation. These documents are valid interpretive rules which are excepted from the A.P.A.'s notice and comment procedures.

■ AHA argues that by virtue of a 1971 order issued by HHS at 36 Fed.Reg. 2,532 (Feb. 25, 1971), all rules issued by HHS, whether legislative or interpretive, are subject to the A.P.A.'s notice and comment requirements. The order states:

Effective immediately, all agencies and offices of the Department which issues rules and regulations relating to public property, loans, grants, benefits or contracts are directed to utilize the public participation procedure of the APA 5 U.S.C. 553.

There is no reason whatsoever to suppose that this order has anything to do with the exception in the A.P.A. for interpretive rules. Section 553(a)(2) of the A.P.A. states that the notice and comment procedures do not apply to matters involving public property, loans, grants, benefits, or contracts. Obviously, by naming precisely these categories, the 1971 order is intended to address this exception and to subject rules in these categories to notice and comment procedures. This contention is supported by the history behind the order. *See* 1 C.F.R. § 305.69–8. But interpretive rules are excepted from notice and comment procedures by virtue of an entirely distinct provision, § 553(b)(A). The 1971 order does not address this provision in any way.

### 4. *Medicare Intermediary Transmittal No. 1102*

This communication concerns the conditions under which payment will be made by Medicare for services even though it has been determined that those services are not ordinarily covered.

Section 1879 of the Social Security Act, 42 U.S.C. § 1395pp(a), states that Medicare will pay for services notwithstanding a determination of non-coverage where both the hospital and the beneficiary, "did not know and could not reasonably have been expected to know that payment would not be made," for the medical services. The statute then provides two circumstances under which the hospital and the beneficiary will be presumed to have had knowledge that the services would not be covered.

First, where payment is made once for non-covered services, HHS shall notify the hospital and beneficiary of the circumstances surrounding the case; thereafter, the hospital and beneficiary will be presumed to know that all comparable services are not covered. Second, where HHS has notified a hospital that a "pattern of inappropriate utilization has occurred in the past," and the hospital has been given a reasonable time to rectify the problem, then the hospital is presumed to know that the type of medical services for which it received notice will not be covered in the future. *Id.*

42 C.F.R. § 405.195 states that there is a general presumption in favor of hospitals that they did not know the services they performed were not covered. It lists five criteria which serve to rebut that presumption. Section 405.332(b) lists four criteria to rebut the favorable waiver presumption. *See also* § 405.330 and 331.

 Against this statutory and regulatory background, it is apparent that Transmittal No. 1102 is not an interpretive rule, but rather is a legislative rule containing procedures governing PROs and hospitals which are not directly derived from statutory or regulatory language. The document states that it "revises existing instructions." Transmittal No. 1102 at cover page. It directs PROs, in mandatory language, to review every case where a hospital has provided non-covered services, to determine if "it was clear and obvious that the services furnished were excluded from coverage." *Id.* at 3432.2. This finding is to be made even where the hospital has a favorable waiver presumption. HHS explicitly calls this a change in policy, and makes no reference whatever to a statute or regulation. *Id.*

HHS also alters the formula by which it will determine whether a hospital has a favorable waiver presumption. It declares the old formula superseded, and provides the new formula:

$$\text{Denial Rate} = \frac{\text{\# of admissions denied after medical review}}{\text{\# of admissions reviewed}}$$

*Id.*

The document then directs how to use the formula:

Beginning April 1, 1984, if a PPS hospital's denial rate exceeds 2.5% in a calendar quarter, it will not qualify for a favorable waiver of liability presumption for the following quarter. However a minimum of 3 denials will be required in a calendar year before a PPS hospital loses its favorable waiver of liability presumptive status.

*Id.*

HHS obviously is doing more than merely announcing its construction of a statute or regulation. No amount of interpretation of § 1879 of the Social Security Act will produce the denial rate formula of this transmittal—only an original act of rulemaking will. The document contains novel policies intended to bind PROs and hospitals, and to implement the PRO program. It is a legislative rule, which is invalid for failing to comply with the notice and comment procedures of the A.P.A.

### 5. *PRO Program Directive No. 2*

 PRO Program Directive No. 2 contains directions to PROs regarding what information must be included in their agreements with hospitals. The directions are referred to in the document as "requirements", which "must be addressed" in the hospital agreements. *Id.* at 1.

Some of the topics which the Directive requires the agreements to address do follow logically from the statutes and regulations. The statutes and regulations pertaining to review requirements (*see* section II(C)(1), *supra*) clearly may be interpreted as requiring hospital agreements to address DRG validation, Admissions Review, etc. But the Directive also imposes specific review obligations on both PROs and hospitals which are not derived from any explicit provisions of the statutes or regulations.

PROs must review all readmissions to hospitals which occur within seven days of prior hospital admission; they must review cases under review for any other reason; they must review at least 5% of all other admissions. *Id.* at 4. They must review transfers to swing beds and units exempt from PPS, and they must identify and review all pacemaker implants and reimplants. *Id.* at 5. All cases involving DRG 468 must be reviewed. *Id.* at 6. PROs may give hospitals no more than twenty-four hours notice of an upcoming on-site DRG validation. *Id.* (IM85–2, a more recent communication, provides that PROs may give hospitals no more than two working days notice.)

These requirements are also found in IM85–2, discussed in section II(C)(1), *su-*

*pra.* As was discussed in that context, the requirements of the Directive are legislative rules which are not interpretations of any statute or regulation. They are original obligations imposed by HHS on PROs and hospitals in order to implement the PRO program. Directive No. 2 is invalid for failure to comply with the notice and comment procedures of the A.P.A.

HHS argues that the new regulations at 42 C.F.R. 466 subpart C cover "the very topics of Directive No. 2" and that therefore the challenge to the document is moot. It is not enough, however, that the new regulations address certain aspects of PRO review requirements. As was true in discussing IM85-2, the specific requirements imposed by Directive No. 2 are not found in or superseded by the new regulations and the complaint as to the Directive is not moot.

### 6. *The Request for Proposals and Contract Provisions*

In implementing the PRO program, HHS issued a Request for Proposals ("RFP"), which solicited proposed contracts from entities seeking to become PROs. AHA claims that the RFP required prospective PROs to include certain provisions in their proposed contracts which are administrative rules, that is, which impose substantive obligations on PROs and hospitals implementary to the PRO program. The RFP and the contract provisions which embody the requirements of the RFP are, AHA contends, invalid for failure to comply with the notice and comment procedures of the A.P.A.

Before addressing the issue of whether the rules in these documents are legislative or interpretive, we must consider the threshold issue of whether any obligations HHS imposes by contracts may be subject to the A.P.A. at all. HHS argues that Congress granted it so much contract making authority as part of the PRO program, that no aspect of the contract making process may be constrained by notice and comment procedures.

Specifically, HHS refers to 42 U.S.C. § 1320c–2(e), which states:

> Contracting authority of the Secretary under this section may be carried out without regard to any provision of law relating to the making, performance, amendment or modification of contracts of the United States as the Secretary may determine to be inconsistent with the purposes of this part. The Secretary may use different contracting methods with respect to different geographical areas.

Congress also authorized HHS to negotiate individual contracts with each PRO and to enter the contract only after it determines the PRO will carry out the contract consistently with the effective administration of the act. 42 U.S.C. § 1320c–2(b)(1). PROs are also directed by statute to consult with HHS regarding what cases they will review under the contract. 42 U.S.C. § 1320c–3(a)(4).

HHS undeniably has considerable authority and discretion under this statutory scheme to contract with PROs. HHS is empowered to enter customized contracts with different PROs in different areas, to be responsive to local conditions. HHS's flexibility in contracting is fundamental to the proper implementation of the PRO program.

But by giving HHS flexibility to contract, Congress did not intend to exempt HHS from the administrative constraints of the A.P.A. 42 U.S.C. § 1320c–2(e) exempts HHS from federal laws relating to *contracting*, not from laws relating to administrative *rulemaking*. HHS may not hide behind its authority to contract in order to evade the A.P.A. Otherwise it could implement the entire PRO program through contract provisions, without promulgating a single regulation or allowing for any public participation. Congress could not have intended so extraordinary a possibility without expressly stating so. To the extent the RFP and contract provisions contain legislative rules which are binding on PROs and hospitals and which implement the PRO program, they are subject to the A.P.A.

*Cf. Buckeye Power, Inc. v. Environmental Protection Agency,* 481 F.2d 162, 170 (6th Cir.1973).

■■■ Several provisions of the RFP impose substantive obligations on PROs and hospitals which are not interpretive of statutes or any regulations, either the old ones or the new. PROs are required to review every elective case from five procedure related DRGs or DRG groups specified in Attachments VII or VIII to the RFP. *Id.* at 15. If the area average admission rate per one hundred Medicare beneficiaries is above the national average, the prospective PRO "is expected" to propose more than five procedure related DRGs or DRG groups for preadmission and preprocedure review; if less than the national average it "may" propose less than five. *Id.* The prospective PRO must agree to review every permanent cardiac pacemaker implantation or reimplantation; and to review every twentieth admission not otherwise under review. It also must agree to perform admission pattern monitoring according to specific procedures included in Attachment V to the RFP. *Id.* at 16.

While it is true that DRG validation and admission pattern monitoring are required by statute and regulation, the RFP imposes specific frequencies and methods for conducting the review which are not based on any explicit legislative provisions. These are original policy determinations by HHS regarding how to implement the PRO program. They are legislative rules, and the RFP and contract provisions incorporating those rules are invalid for failure to comply with the notice and comment procedures of the A.P.A. And as these rules are not found in or superseded by the new regulations, the complaint is not moot as to these documents.

### D. *The Petition for Rulemaking*

AHA also seeks an order compelling HHS to grant the petition for rulemaking it filed with HHS. HHS denied the petition on May 2, 1985.

Both parties agree that the court only may interfere with HHS's denial of the petition if HHS's denial was arbitrary and capricious. *Arkansas Power and Light Co. v. I.C.C.,* 725 F.2d 716 (D.C.Cir.1984). This standard of review is "very narrow" and limits the court to,

> ensuring that the agency has adequately explained the facts and policy concerns it relied on, and that the facts have some basis in the record.

*Id.* at 723.

AHA requested HHS to promulgate regulations implementing the PRO program. HHS denied the petition because, "all appropriate rulemaking processes have been completed and comprehensive regulations governing the implementation of the PRO program have been published." HHS denial of petition for rulemaking, May 2, 1985, at 1. More specifically, in response to AHA's request that HHS issue as regulations the substantive rules contained in the various communications in dispute in this case, HHS responded that,

> all substantive requirements for PRO review are set forth in the Medicare and PRO statutes and regulations. The PRO Transmittals and Directives merely reiterate and further interpret these requirements.

*Id.* at 8.

■■■ This court has carefully considered the record in this case, including the communications and the relevant statutes and regulations, and must conclude that HHS's reasons for denying the petition are not supported by the record. The communications contain substantive rules and establish detailed procedures which govern many fundamental aspects of the PRO program. These rules are found only in the challenged communications. As discussed in section II(C), *supra,* they do not refer to any explicit provisions of the statutes or regulations, and with the exception of the communications discussed in II(C)(3), *supra,* it cannot seriously be maintained that they merely interpret the statutes and regulations. They reflect original policy determinations regarding how to implement the PRO program and they do not merely reit-

erate procedures already defined elsewhere.

Furthermore, the procedures developed in the communications are not found in or superseded by the new regulations. It is true that some general areas of the PRO program covered by the communications are also covered by the new regulations: IM85–2, Directive No. 2, and 42 C.F.R. subpart C all address PRO review activities. But this rough correspondence does not by itself make the complaint as to these communications moot, nor does it respond to AHA's request that the rules in the communications be promulgated as regulations. These communications contain specific rules governing PRO review procedures which do not correspond to any of the published regulations also addressing review procedures. The procedures the communications impose remain binding on PROs and hospitals by virtue of these communications, rather than by any regulation.

HHS has recognized its responsibility and has made an effort to properly implement the PRO program by publishing several sets of regulations. But there remain important aspects of the program which are governed by communications. By continuing to administer aspects of the program in this manner, HHS has circumvented the rulemaking requirements of the A.P.A. and has prevented the public participation in the rulemaking process that Congress intended. HHS's response to AHA's petition is contradicted by the record in this case: the rules in the communications are not interpretive, and they are not superseded by the new regulations. Therefore, HHS's denial of the petition is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A). HHS must submit all of the legislative rules and procedures contained in the challenged communications to the rulemaking process of § 553. The interpretive rules discussed in section II(c)(3) are, of course, excepted.

An appropriate order shall issue.

## ORDER

Upon consideration of the defendants' motion to dismiss or in the alternative for summary judgment, the plaintiff's cross-motion for summary judgment, the papers submitted in opposition thereto, and the complete record in this case, and for the reasons given in the accompanying memorandum, it is hereby

ORDERED that the defendants' motion is granted in part and denied in part; and it is

FURTHER ORDERED that the plaintiff's motion is granted in part and denied in part; and it is

FURTHER ORDERED that PRO Transmittal IM85–2, PRO Transmittal IM85–3, Medicare Intermediary Transmittal No. 1102, PRO Program Directive No. 2, and the Request for Proposals and relevant contract provisions, are invalid for failure to comply with § 553 of the Administrative Procedure Act; and it is

FURTHER ORDERED that Medicare Hospital Manual Transmittal No. 367, § 287.4A, and Medicare Intermediary Manual Transmittal No. 1079, § 3789c, are valid interpretive rules which are excepted from the APA notice and comment procedures; and it is

FURTHER ORDERED that HHS shall submit the substantive rules contained in the invalid communications to § 553 rulemaking procedures in a manner consistent with the memorandum accompanying this order.

### On Motion for Reconsideration

This action is before the court on defendant Department of Health and Human Services' ("HHS") motion for reconsideration or clarification. Oral argument was heard on July 15, 1986. For the reasons stated below, the motion for reconsideration is denied and the motion for clarification is granted.

HHS focuses on the part of the May 30 memorandum in this case where the court ruled that certain provisions of the Request for Proposals ("RFP") and the aspects of contracts embodying those provisions, are substantive rules. Because they are sub-

**470**

stantive rules, they are subject to A.P.A. notice and comment procedures, and they are invalid for failure to comply with those procedures.

HHS argued during consideration of the May 30 order that no provisions included in the contracting process could, as a matter of law, be considered rules subject to notice and comment. This court rejected that argument, because it found no magic in the nomenclature HHS chooses to employ: when HHS imposes an obligation implementing the Peer Review Organization ("PRO") program, it makes a rule, whether or not it calls that rule a part of the contracting process. HHS has great discretion to contract, but its discretion to impose rules implementing the PRO program is circumscribed by the A.P.A.

HHS has raised the identical argument again, and this court finds no reason to reconsider its order.

HHS also requests a clarification that this court's May 30 order invalidating the specified RFP and contract provisions was not intended to be retroactive. HHS seeks to clarify that all PRO actions previously conducted pursuant to the invalidated contract provisions are not now called into question. HHS fears that hospitals might attempt to take advantage of the order and challenge prior PRO determinations of noncoverage, claiming that the PRO reviews were based on invalid contract provisions.

At oral argument, counsel for plaintiff American Hospital Association ("AHA") stated it was never AHA's intention to request such a retroactive order, and counsel for both AHA and HHS stated they did not believe this court's order was intended to have retroactive effect. Accordingly, we clarify that this court's May 30 order is not retroactive.

HHS included two other arguments in its motion. It asks this court to reconsider its ruling on the RFP and contract provisions because these provisions are "general statement[s] of policy". It also asks reconsideration of this court's rulings regarding the challenged communications. These elements of the motion for reconsideration are denied.

Upon consideration of the motion for reconsideration or clarification filed by HHS in this case, the papers submitted, and the oral argument heard, it is hereby

ORDERED that HHS's motion for reconsideration is denied; and it is

FURTHER ORDERED that HHS's motion for clarification is granted; and it is

FURTHER ORDERED that this court's May 30 order is not retroactive as to the existing contract provisions.