**AMERICAN HOSPITAL ASSOCIATION**

v.

**Otis R. BOWEN, Secretary, H.H.S., et al., Appellants.**

**No. 86-5579.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1987.

Decided Dec. 4, 1987.

John F. Daly, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty. and John F. Cordes, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellants.

F. Joseph Nealon, Washington, D.C., for appellee.

Before WALD, Chief Judge, MIKVA and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge MIKVA.

WALD, Chief Judge:

We face here the issue of whether the Department of Health and Human Services ("HHS"), in implementing the system of "peer review" of Medicare outlays called for by Congress in its 1982 amendments to the Medicare Act, erred in not first undertaking the notice and comment rulemaking generally prescribed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 533. Because we conclude that the directives issued and contracts entered into by HHS constitute mere procedural rules or general statements of policy that do not substantially alter the rights or interests of regulated hospitals, we hold that HHS has satisfied the requirements of § 553 of the APA, and therefore reverse the judgment of the district court.

## I. THE FACTUAL SETTING OF THIS CASE

Since 1965, the Medicare program has provided for the reimbursement by the federal government of those medical expenses incurred by persons over 65 and of persons suffering from certain disabilities. Typically, this reimbursement has been paid directly to the hospitals and doctors who provide health care to Medicare recipients.

In 1982, Congress amended the Medicare Act to provide for a new method of reviewing the quality and appropriateness of the health care provided by these medical providers to Medicare beneficiaries. It did so by passing the Peer Review Improvement Act of 1982, Pub.L. No. 97-248, § 143, 96 Stat. 382 (1982), 42 U.S.C. §§ 1320c *et seq.*, which called for HHS to contract with "peer review organizations," or PROs, private organizations of doctors that would

monitor "some or all of the professional activities" of the provider of Medicare services in their areas. 42 U.S.C. § 1320c-3(a)(1). A primary goal of Congress was to put into place a review system that would crack down on excessive reimbursements to hospitals for treatments of Medicare patients.[1]

In passing the 1982 amendments, Congress painted with a broad brush, leaving HHS to fill in many important details of the workings of peer review. The amendments require HHS to designate geographic areas generally corresponding to each state, to be served by individual peer review organizations. 42 U.S.C. § 1320c-2(a). HHS must then enter into an agreement, initially for a two-year term, with a PRO in each area. 42 U.S.C. § 1320c-2(b)(1) and (c)(3). Entities seeking to qualify as PROs must contain a sufficient number of physicians practicing in the PRO area to carry out the requisite review functions. 42 U.S.C. § 1320c-1.

The agency has broad discretion in negotiating each of these contracts. As the district court observed, HHS may negotiate different agreements with each PRO, and it may make agreements without regard to any federal law regarding contracts which it determines to be inconsistent with the PRO program. 42 U.S.C. § 1320c-2(e). *See American Hospital Association v. Bowen*, 640 F.Supp. 453, 457 (D.D.C.1986). A typical provision on which PRO contracts differ is the type of activities that an individual PRO is expected to review. On this contractual term, as on others, the goal of HHS' flexibility is to encourage PROs to be responsive to distinctive community needs and practices, apparently a shortcoming in the system of review preceding the PRO

---

1. The PRO system replaced a system, established by statute in 1972, in which entities known as Professional Standards Review Organizations (PSROs) performed similar reviews of the quality and appropriateness of health care provided to Medicare beneficiaries. *See* Pub.L. No. 92-603, § 249F(b), 86 Stat. 1429 (1972). In repealing it, Congress noted that the PSRO system had generated mixed results. On the positive side, as the Senate report on the 1982 amendments observed, the PSRO system had cut back on some unnecessary services, "thereby m:inimiz[ing] risks to patients and [wasting]

valuable resources that are needed elsewhere." *See* S.Rep. No. 97-494, 97th Cong., 2d Sess. 41 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad. News 781, 817. The PSRO system had, however, "restricted innovation in new approaches to review" and had failed to fulfill its promise of curtailing the spiralling increase in Medicare and Medicaid costs. *Id.* The Senate report accompanying the 1982 amendments voiced confidence that "the new flexibility" of the PRO system would generate savings to the federal government of approximately $50 million between fiscal years 1983 and 1985. *Id.* at 43.

system. See note 1, *supra*. The PRO contract must, however, specify the types of cases it will review, 42 U.S.C. § 1320c–3(a)(4), and it must include negotiated objectives against which the PRO will be judged. 42 U.S.C. § 1320c–2(c)(7). Typically, PROs have been compensated according to fixed-price contracts, under which they receive a pre-determined amount of money for all services performed under the two-year contract.

Under the 1982 amendments, hospitals, in turn, must enter into contracts with the HHS-designated PRO in their area in order to participate in the Medicare program and thus be eligible for reimbursements. The hospital must agree, as part of its contract with the PRO, to allow the PRO to review the validity of diagnostic information provided by the hospital, to review the completeness, adequacy and quality of care provided, to review the appropriateness of hospital admissions, and to review the appropriateness of care provided for which the hospital or health care provider seeks extra Medicare payments. 42 U.S.C. § 1395cc(a)(1)(F). Congress required hospitals to enter into such agreements by November 15, 1984. Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 2347(b).

The principal function of a PRO, once having been designated by HHS and having entered into agreements with hospitals in its jurisdiction, is to review for conformance with the substantive standards of the Medicare Act the professional activities of physicians, hospitals, and other providers of health care. 42 U.S.C. § 1320c–3(a)(1). The standard of review is whether the services and items provided by the doctor or hospital "are or were reasonable and medically necessary," *id.*, and thus whether these activities satisfy the standards for federal government reimbursement under Medicare. 42 U.S.C. § 1320c–3(a)(2). The PRO's determination on whether Medicare should pay for the services in question is generally conclusive. *Id.* When the PRO program first began, these reimbursements were retrospective ones, based upon the "reasonable cost" of providing medical services to Medicare beneficiaries, *see* 42 U.S. C. §§ 1395b; 42 U.S.C. § 1395x(v). Since 1983, when Congress further modified the Medicare system by passing the Social Security Amendments of 1983, Medicare expenses have been paid prospectively to providers according to a predetermined rate based on which "diagnosis related group," or DRG, a patient is deemed to fall into. 42 U.S.C. § 1395ww.[2]

**2.** The prospective payment system (PPS) adopted by Congress in 1983, *see* Pub.L. No. 98–21, § 601, 97 Stat. 149 (1983), essentially provides for hospitals to be paid flat rates for each patient admitted, according to that patient's diagnostic group. The goal of the new payment system, according to a House report on the subject, was "to improve the medicare program's ability to act as a prudent purchaser of services [and] to provide predictability regarding payment amounts for both the Government and hospital. More important, it is intended to reform the financial incentives hospitals face, promoting efficiency in the provision of services by rewarding cost/effective hospital practices." *See* H.R.Rep. No. 98–25, 98th Cong., 1st Sess. 132 (1983), U.S.Code Cong. & Admin. News 1983, pp. 143, 351.

The introduction of the prospective payment system increased both the importance and the scope of peer review. Because the PPS system does not initially take into account variances within a given diagnostic group that may bear on the hospital's true cost—for instance, the severity of a particular patient's illness—hospitals seeking reimbursement may seek what is known as an "outlier" payment to cover the cost of supplemental medical services or of an unex-

pectedly long stay. Likewise, hospitals, having been paid in advance, may have an incentive to provide fewer services and to discharge patients earlier. *Id.* at 143–44. Thus, in addition to the responsibilities conferred upon them by the 1982 statute, PROs must now also review the validity of diagnostic-group assignments and of outlier claims. Indeed, an amendment to the PRO system adopted in 1983 alongside the introduction of the PPS system authorizes sanctions against hospitals found, on the basis of PRO review, to have sought to circumvent the new payment methods by unnecessary admissions, multiple admissions, or similar means. 42 U.S. C. § 1395ww(f)(2). In 1986, after congressional hearings suggested hospitals were indeed discharging patients "quicker and sicker" as a result of the incentives generated by the prospective payment system, Congress further amended the PRO statute to strengthen PRO authority over hospital care. *See* Pub.L. No. 99–272, §§ 9401–9406, 100 Stat. 193–201 (1986) (adding provisions including a requirement that the PRO review, prior to patient admission, all cases involving specified surgical procedures); Pub.L. No. 99–509, §§ 9351–9353, 100 Stat. 2040–47 (1986) (adding provisions requiring,

Beyond those relatively skeletal requirements, Congress left much of the specifics of the hospital-PRO relationship to the inventiveness of HHS, empowering it to promulgate regulations governing PROs in order to implement the peer review program. 42 U.S.C. § 1320c–3(a)(8). The legislative history of the peer review amendments suggests that this was no oversight: Congress apparently expected HHS to design and put into place the numerous procedures necessary to administer the PRO program.

The initial flurry of regulations promulgated by HHS filled in a variety of these details regarding PRO procedures. *See* 42 C.F.R. §§ 412.42; 412.44; 412.46; 412.48; 412.82; 462.100 *et seq.* Many of these procedures were aimed at harmonizing the PRO concept with the new system of reimbursing Medicare providers prospectively. The procedures detailed in these regulations included basic PRO review functions, reporting hospitals' misrepresentations, DRG validation, review of hospital determinations of noncoverage, and payment for coverage exceeding the standard amount allotted for each diagnostic group.

The parties to this case agree that these regulations were promulgated in conformance with the Administrative Procedure Act, 5 U.S.C. § 553, and thus they are not under challenge here.

In addition to these regulations, HHS issued a series of directives and transmittals governing the PRO program that are the subject of this lawsuit. These communications include PSRO Transmittals Nos. 107 and 108, Medicare Hospital Manual Transmittal No. 367 and Medicare Intermediary Transmittal No. 1079, Medicare Intermediary Transmittal No. 1102, and PRO Program Directive No. 2. These transmittals contain a wide variety of instructions, guidelines and procedures covering aspects of the PRO program. HHS also shaped the PRO program when it issued the Request for Proposals ("RFP"), a document soliciting proposed contracts from entities seeking to become PROs. The RFP, among other things, told would-be PROs what review procedures their proposals must address, and what provisions their bids must contain. The contracts entered into between HHS and the PROs contain the provisions required by the RFP.

HHS concedes that neither the transmittals, the RFP, nor the contracts ultimately entered into were issued pursuant to the notice and comment procedures generally required by § 553 of the APA.

The plaintiff in this action is the American Hospital Association ("AHA"), an Illinois nonstock corporation that represents 6,000 member hospitals serving approximately 30 million patients a year, more than 9 million of them Medicare beneficiaries. The facts of its dispute with HHS leading to this lawsuit are essentially as recounted by the district court. *See American Hospital Association*, 640 F.Supp. at 458.

On October 10, 1984, complaining of what the district court termed "the small and incomplete selection of regulations" HHS had published implementing the PRO program and the large number of procedures set forth in documents not published as regulations, AHA filed with HHS a petition for rulemaking, pursuant to 5 U.S.C. § 553(e). In it, AHA requested HHS to promulgate a complete set of regulations governing all aspects of the PRO program.

On December 14, 1984, the then-Secretary of HHS, Margaret Heckler, wrote a letter to AHA's general counsel stating that her staff was preparing a response, but would be unable to meet the 60–day deadline requested by AHA. AHA sent another letter on January 8, 1985, request-

among other things, more extensive PRO review of the quality of care, of certain readmissions, and of hospital decisions with which the patient is dissatisfied). *See also Sustaining Quality Health Care Under Cost Containment: Joint Hearings Before the House Select Committee on Aging and the Task Force on the Rural Elderly of the House Select Committee on Aging*, 99th Cong., 1st Sess. (1985); *Quality of Care Under Medicare's Prospective Payment System: Hearings Before the Senate Select Committee on Aging*, 99th Cong., 1st Sess. (1985); *Examination of Quality of Care Under Medicare's Prospective Payment System: Hearing Before the Senate Committee on Finance*, 99th Cong., 2d Sess. (1986).

ing a date for HHS' response. No response to this letter was ever received.

On January 29, 1985, AHA brought suit against HHS in the District Court for the District of Columbia. Its complaint argued that HHS had circumvented the notice and comment requirements of § 553 of the APA, and asked that the court declare the transmittals and directives, as well as the RFPs and the contracts entered into by HHS and the PROs, invalid for failure to comply with § 553. It also asked the court to order HHS to promulgate all regulations implementing the PRO program in accordance with notice and comment procedures. While this lawsuit was pending, Secretary Heckler stepped down and was succeeded by Otis R. Bowen, who is now the principal named defendant.

The district court, on cross-motions for summary judgment and on HHS' motion to dismiss, held that virtually all of HHS' communications, with the exception of Medicare Hospital Manual Transmittal No. 367 and Medicare Intermediary Manual Transmittal No. 1079, § 3789c, were invalid for failure to comply with the APA's notice and comment requirements. The court's May 30, 1986 order also invalidated the RFPs and the contracts entered thereunder as violative of § 553. We recount the district court's particular analysis in greater detail in the following section of our opinion, but in capsule form, the district court reasoned that the communications it invalidated were not mere interpretive rules exempt from the APA's notice and comment requirements, but rather, substantive legislative rules requiring HHS' adherence to § 553's strictures.

HHS appealed, and on September 29, 1986, the agency was granted a stay pending the decision of this court. We heard argument on September 11, 1987, and now reverse.

## II. DISCUSSION

### A. *The Analytic Framework of APA § 553*

Section 553 of the Administrative Procedure Act requires agencies to afford notice of a proposed rulemaking and an opportunity for public comment prior to a rule's promulgation, amendment, modification, or repeal. Congress, however, crafted several exceptions to these notice and comment requirements, determining that they should not apply

(A) to interpretive rules, general statements of policy, or rules of agency organization, practice or procedure; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

Section 553(b). The issue in this case is whether the various pronouncements made by HHS in the course of its implementation of the peer review program fall within the first class of exceptions: those for interpretive rules, procedural rules, or general statements of policy.

We begin our analysis by noting that Congress intended the exceptions to § 553's notice and comment requirements to be narrow ones. The purposes of according notice and comment opportunities were twofold: "to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies," *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir.1980), and to "assure[ ] that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *Guardian Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 662 (D.C.Cir.1978). In light of the obvious importance of these policy goals of maximum participation and full information, we have consistently declined to allow the exceptions itemized in § 553 to swallow the APA's well-intentioned directive. *See, e.g., Alcaraz v. Block*, 746 F.2d 593, 612 (D.C.Cir.1984) ("The exceptions to section 553 will be 'narrowly construed and only reluctantly countenanced' ") (citation omitted); *National Association of Home Health Agencies v. Schweiker*, 690 F.2d 932, 949 (D.C.Cir.1982), *cert. denied*, 459

U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983) (exceptions to the notice and comment provisions of § 553 are to be recognized "only reluctantly," so as not to defeat the "salutary purposes behind the provisions"); *see also American Federation of Government Employees v. Block*, 655 F.2d 1153, 1156 (D.C.Cir.1981); *American Bus Association v. United States*, 627 F.2d 525, 528 (D.C.Cir.1980); *New Jersey Department of Environmental Protection v. EPA*, 626 F.2d 1038, 1045 (D.C.Cir.1980).

■ The reading of the § 553 exemptions that seems most consonant with Congress' purposes in adopting the APA is to construe them as an attempt to preserve agency flexibility in dealing with limited situations where substantive rights are not at stake. The exceptions have a common theme in that they "accommodate situations where the policies promoted by public participation in rulemaking are outweighed by the countervailing considerations of effectiveness, efficiency, expedition and reduction in expense." *Guardian Federal Savings & Loan Association*, 589 F.2d at 662. Agency actions or statements falling within the three exemptions

> are not determinative of issues or rights addressed. They express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities. They do not, however, foreclose alternate courses of action or conclusively affect rights of private parties. Although an agency empowered to enact legislative rules may choose to issue non-legislative statements, an agency without legislative rulemaking authority may issue only non-binding statements. Unlike legislative rules, non-binding policy statements carry no more weight on judicial review than their inherent persuasiveness commands.

*Batterton*, 648 F.2d at 702 (footnotes omitted).

The function of § 553's first exemption, that for "interpretive rules," is to allow agencies to explain ambiguous terms in legislative enactments without having to undertake cumbersome proceedings. As we explained long ago in *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C.Cir.1952), " 'regulations,' 'substantive rules,' or 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretive rules are statements as to what administrative officer thinks the statute or regulation means." *Id.* (offering as an example of an interpretive rule an agency attempt to give meaning to the statutory term, "interurban railway").

While the spectrum between a clearly interpretive rule and a clearly substantive one is a hazy continuum, *see Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 909 (D.C.Cir.1983) (noting "fuzzy perimeters" of interpretive rule exemption); *see generally* K. Davis, Administrative Law Treatise § 7 (2d Ed.1983), our cases, deploying different verbal tests, have generally sought to distinguish cases in which an agency is merely explicating Congress' desires from those cases in which the agency is adding substantive content of its own. Substantive rules are ones which "grant rights, impose obligations, or produce other significant effects on private interests," *see Batterton*, 648 F.2d at 701–02 (citations omitted), or which "effect a change in existing law or policy." *See Alcaraz*, 746 F.2d at 613 (quoting *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir.1983)). Interpretive rules, by contrast, "are those which merely clarify or explain existing law or regulations," *Alcaraz*, 746 F.2d at 613 (quoting *Powderly*, 704 F.2d at 1098), are "essentially hortatory and instructional," *Alcaraz*, 746 F.2d at 613, and "do not have the full force and effect of a substantive rule but [are] in the form of an explanation of particular terms." *Gibson*, 194 F.2d at 331.

■ Determining whether a given agency action is interpretive or legislative is an extraordinarily case-specific endeavor. As in the area of federal preemption jurisprudence, analogizing to prior cases is often of limited utility in light of the exceptional degree to which decisions in this doctrinal area turn on their precise facts. Nevertheless, recent cases shed some light on the

scope of the § 553 interpretive rules exemption. In *Cabais v. Egger*, 690 F.2d 234 (D.C.Cir.1982), we upheld as interpretive of the Federal Unemployment Tax Act directives from the Secretary of Agriculture recommending to state agencies that they pass legislation conforming their unemployment income plans to a federal scheme as they were required to do under a federal statute. *Cabais* thus stands for the important proposition that where an agency activity merely reminds parties of existing duties, *id.* at 238, it is interpretive, not legislative. Likewise, in *American Postal Workers Union v. United States Postal Service*, 707 F.2d 548 (D.C.Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984), we held that the postal service's new method of calculating the civil service retirement benefits of part-time postal workers constituted an interpretive rule. We concluded this method was exempt from notice and comment because it turned solely on the agency's construction of the statutory term, "average pay." *Id.* at 559. *American Postal Workers* thus demonstrates that the mere fact that a rule may have a substantial impact "does not transform it into a legislative rule." *Id.* at 560. Finally, in *Alcaraz v. Block*, 746 F.2d 593 (9th Cir.1984), the Ninth Circuit upheld as interpretive of the 1981 Budget Reconciliation Act the eligibility standards for participation in the school care program set forth by the Secretary of Agriculture. *Alcaraz* turned on the court's finding that the agency's regulations "merely tracked" the statutory requirements and thus "simply explained something the statute already required." *Id.* at 613. By contrast, the classic example of an agency rule held not to be interpretive—and thus requiring notice and comment as a prerequisite to validity—was the use by a parole board of guidelines establishing specific factors for determining parole eligibility that were "calculated to have a substantial effect on ultimate parole decisions." *See Pickus v. United States Board of Parole*, 507 F.2d 1107, 1112–13 (D.C.Cir.1974).

The function of the second § 553 exemption, for "general policy statements," is to allow agencies to announce their "tentative intentions for the future," *see Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C.Cir.1974), without binding themselves. We have previously contrasted "a properly adopted substantive rule" with a "general statement of policy," observing that while a substantive rule "establishes a standard of conduct which has the force of law" in subsequent proceedings,

> [a] general statement of policy, on the other hand, does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy.

*Pacific Gas & Electric*, 506 F.2d at 38 (footnote omitted); *see also Batterton*, 648 F.2d at 706–07.

The perimeters of the exemption for general statements of policy, like those for interpretive pronouncements, are fuzzy. *See Community Nutrition Institute v. Young*, 818 F.2d 943, 946 (D.C.Cir.1987) (quoting authorities describing the distinction between legislative rules and general policy statements as "tenuous," "blurred," "baffling," and even "enshrouded in considerable smog"). Nevertheless, our prior cases, in seeking to discern the line between these two types of agency pronouncements, have provided considerable guidance. One useful formulation is the two-criteria test set forth by Judge McGowan in *American Bus Association v. United States:*

> First, courts have said that, unless a pronouncement acts prospectively, it is a binding norm. Thus ... a statement of policy may not have a present effect: "a 'general statement of policy' is one that does not impose any rights and obligations".…
>
> The second criterion is whether a purported policy statement genuinely leaves the agency and its decisionmakers free to exercise discretion.

627 F.2d 525, 529 (D.C.Cir.1980) (citations and footnote omitted) (quoting *Texaco v.*

*FPC,* 412 F.2d 740, 744 (3d Cir.1969)). In applying these two criteria, we have observed that an agency's characterization of its own action, while not decisive, is a factor that we do consider. *See Telecommunications Research and Action Committee (TRAC) v. FCC,* 800 F.2d 1181, 1186 (D.C.Cir.1986); *Pacific Gas,* 506 F.2d at 39.

Cases interpreting the § 553 exemption for general statements of policy, like those applying the interpretive rule exemption, also tend to turn on the distinctive facts of the case and thus are not susceptible to easy generalization. We offer here several telling examples of cases upholding agency pronouncements as constituting mere statements of policy, not subject to notice and comment requirements. In *TRAC,* we held that an FCC order eliminating six broadcast regulatory policies that had not been established in rulemaking was a nonbinding general statement of policy, because the Commission had conceded both that it was not bound by its statement of repeal, *see* 800 F.2d at 1186, and that under certain circumstances it might still consider the application of the supposedly defunct regulations. Likewise, in *Pacific Gas,* we held that a Federal Power Commission order setting forth the Commission's view of the proper priority schedule to be followed in curtailing supplies of natural gas to certain customers in the hypothetical event of a natural gas shortage was nonbinding and hence a mere policy statement. Finally, in *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533 (D.C.Cir.1986), we upheld as a mere general statement of policy the Secretary of Labor's "guidelines" on when to cite independent contractors for violating safety standards, placing heavy emphasis on the agency's frequent assertions in the past that the Secretary retained discretion to supersede these guidelines in particular cases. By contrast, we found no such retained discretion in *Batterton,* where we held that the Department of Labor's statistical methodology for calculating unemployment statistics triggering an emergency job program was binding and hence not a mere general statement, or in *Community Nutrition,* where we held that the Food and Drug Administration's determination

of "action levels" that told food producers the allowable limits of certain contaminants in food was also a binding norm requiring the agency to undertake notice and comment procedures.

The distinctive purpose of § 553's third exemption, for "rules of agency organization, procedure or practice," is to ensure "that agencies retain latitude in organizing their internal operations." *Batterton,* 648 F.2d at 707.

> A useful articulation of the exemption's critical feature is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which parties present themselves or their viewpoints to the agency.

*Id.* (citation omitted).

Over time, our circuit in applying the § 553 exemption for procedural rules has gradually shifted focus from asking whether a given procedure has a "substantial impact" on parties, *see Pickus,* 507 F.2d at 1112–13, to inquiring more broadly whether the agency action also encodes a substantive value judgment or puts a stamp of approval or disapproval on a given type of behavior. The gradual move away from looking solely into the substantiality of the impact reflects a candid recognition that even unambiguously procedural measures affect parties to some degree.

While the range of cases applying this exemption may appear idiosyncratic, a few recent decisions of this and other circuits illustrate the scope and limits of the procedural exemption. In *Neighborhood TV Co., Inc. v. FCC,* 742 F.2d 629 (D.C.Cir. 1984), we held that a FCC decision to freeze applications for television licenses on some frequencies affected an applicant's interest "only incidentally," *id.* at 637, and thus was procedural. In *Guardian Federal Savings & Loan Association,* we held that a directive specifying that requisite audits be performed by nonagency accountants was exempt as a procedural measure. And in *United States Department of Labor v. Kast Metals Corp.,* 744 F.2d 1145 (5th Cir.1984), a case to which we shall return in greater depth later, the Fifth

Circuit held that the agency's rules governing the selection of employers for workplace safety investigations was a procedural rule. By contrast, we have struck down as nonprocedural an agency rule foreclosing home health agencies from the right to deal with the Secretary of HHS in order to gain reimbursement for Medicare, *see National Association of Home Health Agencies*, and, as noted earlier, we have held that a parole board's selection of parole eligibility guidelines had the intent and effect of changing substantive outcomes. *See Pickus.*

## B. *The Validity of HHS' Actions With Regard to Peer Review*

Before turning to the specific directives issued by HHS implementing the peer review program, we pause first to make a point about the proper point of reference for our analysis of AHA's § 553 claims. In his opinion, the district judge repeatedly suggested that it was the impact upon the peer review organizations, rather than the impact upon the hospitals whom the PROs monitor, that was dispositive. At the same time, his opinion failed to spell out what burdens the various HHS missives placed on hospitals and other medical care providers. At best it lumped hospitals in with PROs, conclusorily implying that if HHS burdened a PRO, by definition a hospital was burdened, too. *See, e.g., American Hospital Association v. Bowen*, 640 F.Supp. at 463 (stating that PRO Manual IM85–2 "imposed novel obligations implementing the PRO program"); *id.* at 464 (stating that PRO Manual IM85–3 "created procedures governing PROs" and thereby affected "a binding obligation on PROs and hospitals"); *id.* at 466 (describing Medicare Intermediary Transmittal No. 1102 as containing "novel policies intended to bind PROs and hospitals"); *id.* at 467 (stating that PRO Program Directive No. 2 created "original obligations imposed by HHS on PROs and hospitals"); *id.* at 468 (stating that RFP and contracts "impose substantive obligations upon PROs and hospitals").

■ We, on the other hand, regard hospitals and health care providers as the only relevant points of reference from which to analyze whether HHS' communications were sufficiently substantive as to require notice and comment; our perspective in that regard differs from the district court's. A peer review organization is essentially an enforcement agent of the federal government for purposes of the regulations involved here. Hired pursuant to a contract with the government, a PRO monitors the compliance with HHS' strictures of the private hospitals who seek compensation from the agency. The PRO's rights are contractual, stemming from its agreement with HHS. Like an independent contractor hired to construct a government building, the PRO carries out a task for pay at the behest of the government. Should the government seek to restructure the PRO's obligations after the inception of the contractual relationship, the PRO may validly claim a breach of its agreement. But short of this scenario, in situations where the PRO freely entered into a contract with the federal government, one can hardly claim that the PRO—or, for that matter, the independent contractor—has had substantial uninvited burdens placed upon it.

Indeed, PROs have been recognized in analogous situations as agents of the federal government. *Kwoun v. Southeast Missouri Professional Standards Review Organization*, 811 F.2d 401 (8th Cir.1987), involved a civil rights and tort action brought by a doctor against the medical review organization that had recommended that he be excluded from eligibility for Medicare payments for 10 years. A federal district court in the Eastern District of Missouri dismissed the doctor's claim on the grounds that the review organization and its officials enjoyed qualified immunity as state actors, and the Eighth Circuit affirmed. Its conclusion was that the regional peer review officials were "federal officials for the purpose of an analysis of eligibility for immunity," particularly since they were operating within their contract with HHS. 811 F.2d at 407. *See also Smith v. North Louisiana Medical Review Association*, 735 F.2d 168, 173 (5th Cir. 1984) (holding medical review association to

be a "federal entity" performing "a critical federal function of monitoring costs of services provided under the Act for which it is paid by the United States"); *Bushman v. Seiler*, 755 F.2d 653, 655 (8th Cir.1985) (holding consultant who investigated whether doctors' services were necessary and hence eligible for Medicare reimbursement to be agent of government for immunity purposes).

In focusing on the impact upon the PROs of various HHS directives, the district court failed to take heed of the critical difference between PROs and hospitals. It is irrelevant whether an HHS directive burdens PROs by requiring them, as a condition of entering into a contract with HHS, to channel their institutional energies towards particular hospital procedures or to focus on particular perceived abuses. To hold otherwise would be to reach the curious result that, despite Congress' expressed desire that HHS utilize private review outfits, HHS cannot reach through its contracting agents the same result that it could surely reach itself by using its own employees as enforcement agents.

With that cautionary admonition—that the ball on which we must keep our eye is the hospital, not the PRO—we proceed to analyze each of the directives at issue in this case.[3]

### 1. *PRO Manual IM85–2*

PRO Manual IM85–2, promulgated by HHS in March, 1985, is a 70-page document that defines procedures governing many of the review functions of PROs. *See* Joint Appendix (J.A.) at 798. In our view, the district court correctly held IM85–2 to replicate the earlier PSRO Transmittal No. 107, the document initially challenged by AHA, and therefore we, like

the district court, confine our analysis to the later document.

A broadbrush description of IM85–2 is that it maps out an enforcement strategy for the PROs with whom HHS contracts. As the district court observed, the statutes and preexisting regulations that deal with PRO review are relatively sketchy, *see* 640 F.Supp. at 461, and thus IM85–2 makes a significant contribution towards describing the daily functions of PROs. It requires, for instance, that the PRO review at least 5% of all hospital admissions, selected at random. Where a "significant pattern" of unnecessary admissions appears in a particular subcategory of medicine, the PRO is instructed to step up its review to 100% of hospital admissions in the area.

Other requirements of IM85–2 are that the PRO review all hospital admissions occurring within seven days of discharge; all permanent cardiac pacemaker implantation or reimplantation procedures; all other "invasive procedures" where a pattern of abuse has been identified; and all transfers from a hospital to a psychiatric, rehabilitation, or alcohol-drug treatment unit. The manual also bars PROs from delegating their "utilization review" activities unless provided for in the PRO's contract. Finally, it includes an array of rules about notice to hospitals and parties, about the timing of PRO review, and about jurisdictional disputes between hospitals in separate PRO-covered areas.

The opinion of the district court, invalidating IM85–2, rejected the argument by appellants below that the transmittal falls within § 553's exemption for interpretive rules. The court observed, for instance, that "[t]hese requirements and others like them throughout the document are not

---

**3.** We observe at this juncture that several of the HHS communications upon which the district court passed judgment are not under review here.

The first set of communications are those upheld as valid under the APA by the district court: Medicare Hospital Manual Transmittal No. 367, § 287.4A, and Medicare Intermediary Manual Transmitted No. 1079, § 3789c, both of which the district court concluded were interpretive regulations exempt from notice and

comment under § 553. AHA has not cross-appealed from these rulings, and we therefore leave the district court determination standing.

The second communication is Medicare Intermediary Transmittal No. 1102, which the district court invalidated as a legislative rule requiring notice and comment rulemaking. Appellant has declined to list this ruling among those he appeals, *see* Brief for Appellant at 17 & n. 19, and we therefore leave standing the finding of invalidity.

mere statements of what HHS thinks the statutes and regulations require. These are precise obligations which, while consistent with broad statutory directives, are not interpretations of any explicit statutory provisions." 640 F.Supp. at 463. The district court opinion also notes that "the procedures in the document are unmistakably absent from the statutes and regulations, and it is apparent that the document is HHS' fundamental source for implementing PRO review functions. It does not merely interpret or elucidate HHS's official position." 640 F.Supp. at 462. Here, as elsewhere in its opinion, the district court's heavy focus on why the interpretive rule exemption did not apply apparently reflects the overwhelming emphasis placed on that prong of § 553 by HHS in its arguments below, although the agency did technically preserve its objections on the grounds that the other two § 553 exemptions applied.

■ While we share the view of the district court that the commands of IM85–2 are not valid as interpretive rules, we find this conclusion beside the point. The requirements set forth in the transmittal are classic *procedural* rules, exempt under that distinctive prong of § 553. The bulk of the regulations in the transmittal set forth an enforcement plan for HHS's agents in monitoring the quality of and necessity for various operations. They essentially establish a frequency and focus of PRO review, urging its enforcement agents to concentrate their limited resources on particular areas where HHS evidently believes PRO attention will prove most fruitful.

As we have previously observed, enforcement plans developed by agencies to direct their enforcement activity warrant considerable deference. *See, e.g., International Union, UAW v. Brock*, 783 F.2d 237, 251 n. 18 (D.C.Cir.1986) (rejecting argument that an internal directive on Labor Management Services Administration enforcement priorities was a "legislative rule" warranting notice and comment); *Davis Walker Corp. v. Blumenthal*, 460 F.Supp. 283 (D.D.C. 1978) (upholding as procedural rule exempt from notice and comment procedures a

"trigger price mechanism" used by the Department of the Treasury for enforcing the Antidumping Act); *cf. Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir.1986) (holding Labor Department's enforcement guidelines stating when mine operators may be cited for violating safety standards to be a "general statement of policy" and thus exempt under § 553 from notice and comment requirements).

The Fifth Circuit's decision in *United States Department of Labor v. Kast Metals Corp.*, 744 F.2d 1145 (5th Cir.1984), is particularly instructive with regard to this manual. In *Kast Metals*, the court of appeals held that the Occupational Safety and Health Administration ("OSHA") had validly developed a calculus to target employers for inspection, despite the fact that this calculus had been adopted without notice and comment rulemaking. The court reasoned that OSHA's inspection plan, known as CPL 2.25B, fell far short of the sort of investigative activity likely to have the intent or effect of substantially altering party behavior. *Id.* at 1150. "The creation and use of CPL 2.25B to select employers for inspection did not of itself constitute investigation; rather, the plan sets forth procedural steps to guide the agency in exercise of its statutory authority to conduct investigations." 744 F.2d at 1150 (footnote omitted). In classifying OSHA's rule as procedural under § 553, the Fifth Circuit wrote, "[t]he Secretary used CPL 2.25B to concentrate OSHA's inspection resources in industries with the highest potential for safety and health violations.... The plan is procedural on its face." *Id.* at 1152. Like OSHA rule CPL 2.25B, HHS Manual IM85–2 operates to concentrate agency inspection resources in areas (here, medical procedures) with the highest potential for statutory violations (here, violations of Medicare's reimbursement standards), and like CPL 2.25B, HHS' manual is procedural on its face.

We venture the guess that, had HHS established identical terms governing the frequency and focus of review by directly issuing orders to its own officers, the agency's enforcement plan would then appear more unambiguously as a valid use of its

enforcement authority. But it is substance, not form, to which § 553 looks: the fact that the agency reached the identical result by operating through a private intermediary under contract with the agency hardly dictates a different result under § 553.

The manual imposes no new burdens on hospitals that warrant notice and comment review. This is not a case in which HHS has urged its reviewing agents to utilize a different standard of review in specified medical areas; rather, it asks only that they examine a greater share of operations in given medical areas. Were HHS to have inserted a new standard of review governing PRO scrutiny of a given procedure, or to have inserted a presumption of invalidity when reviewing certain operations, its measures would surely require notice and comment, as well as close scrutiny to insure that it was consistent with the agency's statutory mandate. *See, e.g., Pickus.* But that is not this case.

At worst, Manual IM85–2 burdens hospitals by (1) making it more likely that their transgressions from Medicare's standards will not go unnoticed and (2) imposing on them the incidental inconveniences of complying with an enforcement scheme. The former concern is patently illegitimate: Congress' very purpose in instituting peer review was to crack down on reimbursements for medical activity not covered by Medicare. As for the second burden, case law clearly establishes that such derivative burdens hardly dictate notice and comment review. *See, e.g., Neighborhood TV Co.; Kast Metals.* Accordingly, we hold that PRO Manual IM85–2 is a procedural rule exempt from § 553's notice and comment requirements.

### 2. *PRO Manual IM85–3*

PRO IM85–3, issued in May, 1985, is a 22–page transmittal letter that sets forth an enforcement plan for PROs to review hospital determinations that patients are no longer covered by Medicare and thus may be billed for its services. *See* J.A. at 868. The district court concluded that this transmittal replicates PSRO Transmittal 108,

originally challenged by AHA, and therefore concentrated its attention on the later communication. We agree with that analysis, and do likewise.

IM85–3, among other things, provides detailed procedures by which PROs are to review denial notices. It commands PROs to require hospitals to keep a monthly list of denial notices and to give it to the PRO, to scrutinize 10% of the cases from this list, and to evaluate each randomly chosen case for medical necessity and appropriateness.

■ We review IM85–3 under the same principles that governed our evaluation of IM85–2. As in the case of IM85–2, the district court premised its invalidation on its determination that the transmittal letter in question was not valid as an interpretive rule, and as in the case of IM85–2, we regard that determination as correct yet beside the point. PRO IM85–3 is another procedural rule providing directions to PROs to target the frequency and focus of their enforcement efforts. It neither changes the standard of PRO review, nor imposes anything greater than incidental mechanical burdens on regulated hospitals. The selection of denial notices as an area of special enforcement focus is well within HHS' discretionary enforcement authority. The notice is therefore valid under the same *Kast Metals* analysis under which we sustained the preceding transmittal.

### 3. *PRO Program Directive No. 2*

PRO Program Directive No. 2, issued on August 3, 1984, is an eight-page communication giving PROs directions regarding what information must be included in their agreements with hospitals. *See* J.A. at 82. The directive identifies three broad areas that PRO-hospital agreements must address: (1) administrative considerations; (2) review and related activities; and (3) subcontracted "quality review." It states that these areas "are not intended to be all inclusive."

As the district court observed, many of the topics which the directive requires the agreements to address do follow logically from the Medicare statute and the valid regulations promulgated thereunder.

These topics include the directive's requirements that hospital agreements address DRG validation and admissions review.

The district court further suggested, however, that a number of additional "specific review obligations" imposed by the directive do not qualify as interpretive rules. *See* 640 F.Supp. at 466. These obligations include the requirements that PROs review all readmissions to hospitals which occur within seven days of prior hospital admission; all cases under review for any other reason; at least 5% of all other admissions; all transfers to swing beds and units exempt from PPS; and all pacemaker implants and reimplants. They also include the requirement that PROs review all cases involving a specific diagnostic group, DRG 468, and that they give hospitals no more than twenty-four hours notice of an upcoming onsite DRG validation. Accordingly, it held that the directive was invalid because the agency had failed to initiate notice and comment proceedings.

█ We again disagree. As with its analysis of PRO IM85–2 and PRO IM85–3, the district court analyzed this directive only in terms of § 553's interpretive-rule exemption, overlooking the more relevant exemption, that for procedural rules. The obligations set forth in PRO Program Directive No. 2 merely sculpt the enforcement activity of the PROs, choosing within the vast terrain of legitimate review activity specific pockets of hospital activity and behavior for more consistent scrutiny. In this area, the greater surely includes the lesser: that is, the greater authority of an agency to review all hospital activity includes the lesser authority to train its reviewing resources on a subset of that activity likely to include a heavier dose of abuse.

No doubt the searchlight of PRO scrutiny may expose as undeserving hospital claims for Medicare reimbursement in certain areas. Under this directive, for instance, readmissions of the same patient to a hospital will be reviewed with more regularity than will first-time admissions. This policy no doubt reflects HHS' determination that, under the system of prospectively compensating hospitals for admissions of patients to given diagnostic groups, hospitals have a great incentive to maximize the number of brief hospital stays and thus would be tempted to segment a given patient's stay at a hospital into two stints. Far from imposing a new substantive burden on hospitals, the agency's decision to focus its resources on such likely problem areas gives more full effect to the intent of the congressional framers of the peer review amendments.

### 4. *The Request for Proposals and Contract Provisions*

The lifeblood of the peer review system is the contracts signed between the peer review organization and the agency. In its opinion, the district court concluded that several provisions of the typical contracts signed between the agency and the PROs were legislative, not interpretive, and accordingly invalidated not only the provisions in question, but also the request for proposals that called for the adoption of these procedures in the ensuing contracts.

#### (a) *The Request for Proposals*

Before examining the specific contractual provisions at issue, we turn first to analyze the role of the RFP in the process of contract formation between HHS and the PROs. The request for proposals is a document issued by HHS soliciting proposed contracts from entities seeking to become PROs. It is a mammoth sheaf full of detailed specifications, charts, and forms: the RFP included in the joint appendix in this case runs 335 pages and spells out in some detail the arrangements HHS expected to see in PRO contracts. *See* J.A. at 294. Broadly stated, the RFP describes the technical procedures HHS expects PROs to follow, sets forth guidelines akin to those in IM85–2 and IM85–3 on the sampling strategies it wishes its enforcement agents to deploy, including special focus on particular areas of medicine and on DRGs whose average admission rates in the area exceeds the national average. Many of the terms set forth in the RFP are duplicative of the transmittals to PROs already dis-

cussed. Because it concluded that several of these terms contained legislative rules, not interpretive ones, the district court invalidated the RFP as containing "legislative rules," *see* 640 F.Supp. at 468, and the appellees seek affirmance under a similar theory.

We disagree. We instead regard the RFP as a nonbinding "general statement of policy," exempt from notice and comment requirements under § 553. The RFP binds neither the agency nor the PROs to whom it is sent. Rather, like the initial communication between parties negotiating to hammer out a contract, it establishes "talking points" and provides a foundation from which the agency and the would-be PRO can negotiate. In § 553 jargon, it allows the agency to announce its "tentative intentions for the future," *see Pacific Gas & Electric Co.*, 506 F.2d at 38, while leaving the agency open to modifications based on the demands or requests of local PRO aspirants.

It is surely true that in negotiations over PRO contracts, HHS is a monopolist and thus has the upper hand in bargaining. However, final PRO contracts have been known to differ from the RFP, and in any event our cases construing this exemption make plain that even the possibility of the nonapplication of a given statement can entitle the agency to claim shelter under the "general statement of policy" exemption. *See, e.g., Pacific Gas & Electric Co.* (agency free to abandon tentative plans for gas rationing in event of shortage); *Brock v. Cathedral Bluffs* (agency free not to apply guidelines on mine operator violations because such guidelines were only a "general rule"). Under the *American Bus Association* formulation described earlier, the RFP neither has "a present effect" nor does it prevent future exercises of discretion on the part of agency decisionmakers. Accordingly, we conclude that the district court wrongly invalidated those parts of the RFP it deemed legislative in character. The discussion of whether particular terms of the hospital-PRO relationship in fact were unacceptably substantive and thus required notice and comment rulemaking is better suspended until our discussion of the contracts that incorporated those terms, for it is at the stage of contract formation that those terms suggested by HHS became binding.

(b) *The PRO Contracts*

We now turn to the contracts themselves. A preliminary question is whether these documents are subject to the strictures of the Administrative Procedure Act at all. HHS argues, as it did below, that apart from any § 553 exemption, Congress has already granted it exemption from the various requirements of the APA by conferring upon the agency plenary contract-making authority. HHS refers us to 42 U.S.C. § 1320c–2(e), which states:

> Contracting authority of the Secretary under this section may be carried out without regard to any provision of law relating to the making, performance, amendment or modification of contracts of the United States as the Secretary may determine to be inconsistent with the purposes of this part. The Secretary may use different contracting methods with respect to different geographic areas.

Congress, moreover, authorized HHS to negotiate individual contracts with each PRO and to enter the contracts only after it determines the contract is consistent with the effective administration of the Act. 42 U.S.C. § 1320c–2(b)(1). Likewise, PROs are directed by statute to consult with HHS regarding what cases they will review under the contract. 42 U.S.C. § 1320c–3(a)(4). So it is evident that Congress intended HHS to exercise significant discretion over the generation of individual PRO contracts. And it is equally apparent that, for the PRO program to have any vitality as a means by which the federal government can respond to localized medical practices, the department must be vested with much discretion to tailor PRO contracts to diverse needs.

Nevertheless, it is a considerable leap from concluding that HHS has considerable contractual discretion to concluding that the agency has received a blank check

from Congress to adopt any contractual provision whatsoever without undertaking notice and comment review. We believe the plain meaning of the exemption codified in 42 U.S.C. § 1320c–2(e) is to exempt HHS from those laws "relating to the making, performance, amendment or modification of contracts"—that is, the vast corpus of laws establishing rules regarding the procurement of contracts from the government. *See* 41 U.S.C. § 251 *et seq.* To include among this rather self-contained corpus the general restraints of the Administrative Procedure Act is a step we decline to make without more specific evidence that Congress intended to exempt HHS from the requirements of the APA. The portion of the Senate Report dealing with peer review makes no reference to superseding the APA; nor does it in any way suggest HHS' alternative reading of the peer review contracting exemption: that the exemption was meant to retract legislatively HHS' waiver of the APA's own contract-making exemption. *See* S.Rep. No. 97–494, 97th Cong., 2d Sess. 40 (1982).

■ Under these circumstances, we are understandably reluctant to read the Act's language as restoring a broad exemption from all APA requirements that would allow HHS on its own to modify vitally important provisions of peer review. *Cf. National Association of Psychiatric Treatments Centers for Children v. Weinberger,* 658 F.Supp. 48 (D.Colo.1987) (holding APA's contract exemption did not authorize agency's unilateral decision to include substantive provisions regarding reimbursement of health care providers in individual health-care provider contracts); *Lindahl v. OPM,* 470 U.S. 768, 779, 105 S.Ct. 1620, 1627, 84 L.Ed.2d 674 (1985) (question of whether a statute precludes review " 'is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved' ") (quoting *Block v. Community Nutrition Institute,* 467 U.S. 340, 345, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984)). The contrary conclusion would permit the agency to side-step both Congress and the public and thus to impose its own very substantive conceptions upon the peer review concept checked only by the rather remote possibility of subsequent congressional repudiation of its administrative initiatives. As the district court, reaching the same result that we do, observed:

HHS may not hide behind its authority to contract in order to evade the A.P.A. Otherwise it could implement the entire PRO program through contract provisions, without promulgating a single regulation or allowing for any public participation. Congress could not have intended so extraordinary a possibility without expressly saying so.

640 F.Supp. at 467. Accordingly, we conclude that any contract provisions that are legislative are subject to § 553's notice and comment requirements, at least while HHS' waiver of the APA's contract-making exemption is still in effect. We now move on to discuss those contracts.

■ Most aspects of the contracts between HHS and its PROs are patently unexceptionable. In substantial measure these contracts either describe the technical terms of PRO-hospital and PRO–HHS interaction or restate the provisions of the previously discussed directives and manuals that we have concluded fell within § 553's exemptions to notice and comment. The particular provisions cited by the district court in its opinion likewise cause little concern. Those provisions require PROs to review every elective case from five specific DRGs; state that if an area average admission rate per 100 Medicare beneficiaries is above the national average, a PRO "is expected" to propose more than five specific DRGs for preadmission and preprocedure review; and state that if the admission rate is less than the national average the PRO "may" propose less than five such groups. 640 F.Supp. at 468. Additionally, the district court cited contractual provisions requiring PROs to review every permanent cardiac implantation or reimplantation, to review every twentieth admission not otherwise under review, and to perform admission pattern monitoring under specified procedures. *Id.* We are

untroubled by these provisions, which seem not unlike those in IM85-2 and IM85-3 that we upheld as legitimate means of structuring HHS' enforcement authority and thus exempt as procedural under § 553.

Appellees do focus our attention on a particular feature of these contracts that warrants greater discussion: the highly specific "objectives" set forth in each PRO contract included to Congress' command that numerical objectives be negotiated for each PRO. *See* 42 U.S.C. § 1320c-2(c)(7). The parties have included in the joint appendix a sample PRO contract that contains several of these objectives. *See* J.A. at 929ff. The contract, between the West Virginia Medical Institute, Inc. and HHS, sets among its objectives the following: that it "reduce 3,498 unnecessary or inappropriate admissions and invasive procedures"; "reduce 5,425 unnecessary or inappropriate admissions in 22 specific hospitals"; "reduce the number of unnecessary readmissions in selected DRGs that occur within 7 days of a hospitalization as a result of substandard care during the prior admission by 20 percent"; "reduce 125 avoidable deaths over the two-year period" in the areas of pulmonary embolisms and acute myocardial infarctions; "reduce by 528 cases the incidence of unnecessary surgery or other invasive procedures"; and "reduce selected postoperative complications by 50." *Id.*

■■ Read literally, these objectives should cause little concern. The peer review amendments do specifically require that the PRO contract include negotiated objectives against which the PRO will be judged, *see* 42 U.S.C. § 1320c-2(c)(7), and under the *Kast Metals* principle discussed earlier, there surely is no reason an agency need undertake notice and comment procedures to determine which substandard practices to root out first. Moreover, each objective cited above is worded very generally and clearly incorporates the substantive standard for reimbursement under the Medicare statute, *i.e.*, whether a given procedure was indeed necessary. So long as the standard of review remains unchanged, the focus and timing of review are matters for agency discretion, falling well within § 553's procedural exemption.

Appellees, however, urge that there is apparently no way for a PRO to meet its precise contractual objectives with certainty, and thus that the objectives are artificial figures that can only do mischief. The argument proceeds as follows. If the objective of reducing 125 avoidable deaths over a two-year period is to have any real meaning, one must at a minimum know how many avoidable deaths took place over the preceding two-year period. Yet at least for the period of the initial PRO contract, the one in which these objectives are embedded, that information is apparently unavailable. Moreover, at oral argument, counsel for HHS was unable to offer any alternative practical explanation of how these numerical objectives could be met during the initial two-year period. It remains to be seen whether HHS will compile figures from these initial two years and use them to conduct later comparisons of actual performance and contractual goals.

In light of the difficulty of actually applying these objectives during the initial two-year contractual period, appellees fear that PROs, desirous of having their lucrative two-year contracts renewed, will find overwhelming the need to generate statistics that show they have met these "objectives." In so doing, appellees worry, PROs will act to deter medical procedures that in fact fully satisfy Medicare's substantive standards. If for instance, a hospital is tied to an objective of "100 fewer unnecessary admissions," a PRO might press its participating hospitals to cut down absolutely on the number of admissions, unnecessary or otherwise, in an effort to produce numbers purporting to demonstrate that it had met its objectives. If such were HHS' intent, or even the likely result of this practice, it might indeed change by indirection the substantive standards for Medicare reimbursement and require notice and comment for validity.

■■■ concerns that such is the design or will be the effect of the contract objectives are allayed, however, by several factors which lead us to the conclusion that

the contractual performance objectives are best classed as "general statements of policy" exempt from notice and comment under § 553.

Chief among them is HHS' insistence that these norms are merely hortatory and that the agency will put no stock in the absolute reduction of given medical procedures as a criterion for renewal of PRO contracts. *See, e.g.*, Brief for Appellants at 33–34 (stating that "[s]uch a goal does not affect the outcome of PRO review in any particular case" and that it "imposes no obligations on providers"). This insistence that these numbers are merely what HHS counsel termed at oral argument "bilateral negotiated predictions" presumably cuts down on the climate of pseudoscientific precision that could otherwise envelop the objectives and subtly stiffen substantive standards. Although the dissent is certainly correct that we are not compelled to defer to agency characterizations of rules as "general statements of policy," *see* diss. op. at 1058, its assertion that in giving weight to HHS' characterization of the contract objectives as hortatory goals we act in a manner "incompatible with precedent in this circuit," *see id.* at 1058, is conclusory in the extreme. As we noted in *TRAC,* "[i]t is well established that a court, in determining whether notice and comment procedures apply to an agency action, will consider the agency's own characterization of the particular action." 800 F.2d at 1186 (citing *Brock v. Cathedral Bluffs,* 796 F.2d at 537, and *Pacific Gas & Electric Co.,* 506 F.2d at 38). The objectives included in the various PRO contracts, it also bears mention, lack other traditional indicia of bindingness for § 553 purposes, for example, publication in the Code of Federal Regulations. *See TRAC,* 800 F.2d at 1186 (" '[t]he real dividing line between regulations and general statements of policy is publication in the Code of Federal Regulations' ").

▇ Second, HHS' assurance—backed up by the absence of a written policy or contract provision to the contrary—that it will not sanction any existing PRO for failure to meet its goals suggests the objectives are not binding. Thus, they should not be expected to induce PROs to press unduly for cutbacks in Medicare-covered procedures. The objectives appear basically to be goals, not binding norms. *See, e.g., Brock v. Cathedral Bluffs,* 796 F.2d at 537–38 (Scalia, J.) (where Secretary of Labor retained discretion to use or not use independent contractor enforcement guidelines, such guidelines are best viewed as general statements of policy).

▇ Third, each objective that has come to our attention carefully replicates the substantive standards of the Act, urging reductions, for example, in "unnecessary" deaths or invasive procedures. As such, on its face each objective seems geared to focusing the agency's discretionary enforcement powers. Under the *Kast Metals* principle discussed earlier, agency decisions on where to concentrate enforcement efforts within a universe of valid targets need not be prefaced by notice and comment procedures.

▇ Fourth and finally, we note that our decision today in no way forecloses the right of a hospital to bring a claim based on § 553 of the APA if in fact the contract objectives turn out to what HHS insists they are not: thinly veiled attempts to change the substantive standards of the Medicare Act. The dissent is of course correct that in an ideal world one could ascertain at the outset the need for notice and comment. *See* diss. op at 1061. But where, as here, the facts are so wholly ambiguous and unsharpened as not to present a purely legal question "fit ... for judicial decision," *cf. Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), and where the agency's characterization of its action would fit them cleanly into a § 553 exemption, we think it the most prudent course to await the sharpened facts that come from the actual workings of the regulation in question before striking the objective down as violative of the APA. *Cf. Brock v. Cathedral Bluffs,* 796 F.2d at 538 ("we in our review of the Commission must be reluctant to find a secretarial commitment ... *where none clearly appears* ") (emphasis added).

Without evidence to the contrary, we cannot say that language so wholly mirroring the substantive standards of the Medicare statute was either included with the intent or has had the effect of inducing PROs and hospitals to crack down on necessary procedures. The false precision of the PRO contractual objectives may well be ill-advised, but at this point we cannot say that they amount to binding norms. Accordingly, we conclude that the rhetorical PRO "objectives" are best classed as "general statements of policy," and thus exempt from notice and comment under § 553.[4]

## III. CONCLUSION

For the foregoing reasons, we conclude that the Secretary of HHS has implemented the peer review program in accordance with § 553 of the Administrative Procedure Act, and accordingly the judgment of the district court is

*Reversed and remanded.*

4. In judging the negotiated contract objectives to be valid under § 553, we also observe the practical unworkability of the contrary conclusion. Were HHS' contract objectives not exempt from § 553's notice and comment requirements, as urged by AHA and by the dissent, HHS would then have to undertake separate notice and comment proceedings on an array of objectives in each of the more than 50 separate PRO jurisdictions every two years. While we do not premise our decision on this point, we consider it a valid one, in light of the obvious concern with not paralyzing agencies that animated Congress in including the exemptions in § 553.

We do not find that the Ninth Circuit's decision in *W.C. v. Bowen*, 807 F.2d 1502 (9th Cir. 1987), emphasized heavily by appellants and by the dissent, compels a different decision in this case. In *W.C.*, the Ninth Circuit held that the "Bellmon review program," under which HHS had determined to review those decisions of administrative law judges upholding disability benefits in more than 70% of cases, was a substantive rule and not merely interpretive of existing law. The circuit reasoned that the Bellmon program "changed existing policy," observing that before adoption of the program, "decisions from one ALJ were no more likely to be reviewed than those of another. Nor was any class of claimants more likely to be reviewed." *Id.* at 1504. Thus, the district court in *W.C.* found, "it caused those judges to deny benefits in close cases where benefits might previously have been granted." *Id.* at 1505.

Two profound differences stamp *W.C.* as inapposite to this case. First, and most important, unlike in *W.C.*, there has been no finding that HHS' objectives have in fact caused, *sub rosa*, a shift in the underlying standard of Medicare review. If experience with peer review ultimately bears out AHA's concern that the contract objectives do indeed lead to a more parsimonious reimbursement policy, then, as we note above, we might well need to reconsider whether the objectives are violative of § 553. A policy initially classed as a general statement is not immunized from subsequent judicial review for conformity with the APA if later developments show the agency to be using it as binding policy. But unlike in *W.C.*, it is premature for us to make that determination in the absence of anything except speculation.

Second, the nature of the regulation at issue in *W.C.* is facially quite different from that in this case. In this case, as in *Kast Metals, supra*, the regulation in question on its face simply borrows the substantive standards of the statute in question and seeks to channel agency enforcement resources toward ferreting out violations of that statute. Such discretionary deployment of enforcement resources is classically exempt from the notice and comment requirement of § 553. The dissent's contentions in this case thus in essence boil down to the assertion that in setting a goal of, say, "100 fewer unnecessary admissions," HHS in fact intends something radically different: the elimination of 100 admissions, without regard to whether they meet the substantive standards of necessity encoded in both the Medicare statute and in the contract objectives. In the utter absence of evidence to the contrary, we do not share this fear of agency doublespeak.

*W.C.*, however, involved far more than a dispute over whether an agency could be trusted to adhere to the wording of its own regulation. *W.C.* involved an agency attempt to impose a tough new substantive barrier impeding disability claimants from garnering benefits. Prior to the imposition of the Bellmon Review Program that was at issue in *W.C.*, decisions by ALJs favorable to disability claimants "would not have been reviewed. They would have become final decisions binding both the Secretary and claimant. The program [thus] affects individual rights." *W.C.*, 807 F.2d at 1505 (citation omitted). The Bellmon Amendment passed by Congress under whose rubric the Secretary acted did not mandate the creation of such a barrier. The amendment simply called upon the Secretary to implement a program of reviewing decisions by ALJs, *see W.C.*, 807 F.2d at 1503 n. 2, without stating which ALJs should have their decisions reviewed. As the Ninth Circuit pointedly stated in *W.C.*, "The Secretary, not Congress, formulated the program to select individual cases for own-motion review. Congress specifically omitted any basis for such review in the final amendment.... In exercising [his] discretion, the Secretary enacted in substantive rule." *Id.* at 1505.

MIKVA, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority in all but the final part of its excellent and thorough opinion. I cannot agree that specific numerical objectives for reducing reimbursed services in a particular geographic area "are best classed as 'general statements of policy.'" Majority opinion ("Maj. op.") at 1056. I therefore would not exempt these numerical objectives from the notice and comment requirements of the Administrative Procedure Act (APA).

The majority recognizes that these numerical objectives can and are intended to produce significant effects. It acknowledges that the numerical objectives are "highly specific," requiring a PRO, for example, to "reduce 5,425 unnecessary or inappropriate admissions in 22 specific hospitals." Maj. op. at 1055. By following such strict guidelines, a PRO may end up denying reimbursements for services that qualify as "medically necessary" under medicare law. In the end, however, the majority closes its eyes to this possibility, preferring to "await the sharpened facts that come from the actual workings of the regulation." Maj. op. at 1056. Because I cannot blink away the likely consequences of such specific objectives, and because the APA ensures participation in rulemaking before, rather than after, the fact, I dissent.

I.

The majority's reasons for adopting a "wait and see" approach are unpersuasive. Above all, the majority uncritically accepts an agency's own description of its action as a "policy statement" rather than a "substantive rule." The majority says its "concerns are allayed" because the Department of Health and Human Services (HHS) "insist[s] that these [numerical] norms are merely hortatory." Maj. op. at 1056. While claiming it is only "giving weight" to HHS' characterization, maj. op. at 1056, the majority defers to an extent that I believe is incompatible with this Circuit's precedents.

In *Community Nutrition Institute v. Young,* 818 F.2d 943 (D.C.Cir.1987), this court confronted a claim by the Food and Drug Administration that certain of its rules were interpretive, rather than substantive, and thus exempt from notice and comment. Far from acquiescing in that assertion, the court gave it only "some, albeit 'not overwhelming,' deference" and ultimately reversed the agency's finding. *Id.* at 946 (quoting *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 537 (D.C.Cir.1986)). The court took the same tack in *Environmental Defense Fund, Inc. v. Gorsuch,* 713 F.2d 802, 816 (D.C.Cir. 1983). And, in *Citizens to Save Spencer County v. EPA,* 600 F.2d 844 (D.C.Cir. 1979), our Circuit found that the "label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact." *Id.* at 879 n. 171 (quoting *Lewis–Mota v. Secretary of Labor,* 469 F.2d 478, 481–82 (2d Cir.1972)).

This approach conforms with more general APA precedents. Because of the "salutary effect of the [APA's] public comment procedures," courts should "only reluctantly ... recognize exemptions therefrom." *Humana of South Carolina v. Califano,* 590 F.2d 1070, 1082 (D.C.Cir. 1978). As this court further noted in *American Bus Ass'n v. United States,* 627 F.2d 525 (D.C.Cir.1980), "Congress was alert to the possibility that these exceptions [from notice and comment] might, if broadly defined and indiscriminately used, defeat the section's purpose. Thus, the legislative history of the section is scattered with warnings that various of the exceptions are not to be used to escape the requirements of section 553." *Id.* at 528.

Nothing in this policy of giving courts the final word when construing the APA has been altered by *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The *Chevron* Court counseled greater deference, but only when a court "reviews an agency's construction of *the statute which it administers*"—when an agency makes "policy and ... rules to fill any gap left, implicitly or explicitly, by

Congress." *Id.* at 842, 843 (emphasis added).

## II.

The majority's deference to HHS' characterization of its numerical objectives as "merely hortatory" is especially inappropriate because it is so at odds with the facts. Those facts demonstrate that (1) the numerical objectives are designed to reduce reimbursement levels and (2) because of this intended effect, they may exclude "medically necessary" services from medicare coverage. It is this risk of unwarranted exclusions that necessitates notice and comment rulemaking.

### A.

As the majority concedes, Congress' purpose in introducing Peer Review Organizations (PROs) into the medicare statute in 1982 was to "crack down on excessive reimbursements to hospitals." Maj. op. at 1041. Numerical objectives supplied the means for attaining that end. Congress found the prior system of professional standards review organizations to be defective, because "widespread inappropriate usage of costly health care services" persisted. S.Rep. No. 494, 97th Cong., 2d Sess. 41 (1982), U.S. Code Cong. & Admin.News 1982, pp. 781, 817. The inauguration of PROs was therefore promoted as a way of getting "entities who have proven their effectiveness to enter into *performance based contracts* for the conduct of review." *Id.* (emphasis added).

Congress made these contracts "performance based" by requiring that numerical objectives be negotiated for each PRO. *See* 42 U.S.C. § 1320c–2(c)(7) (1982). These objectives were thus the crucial mechanism for reducing reimbursements; they were *intended* to have that effect. Indeed, the sample PRO contract in this case unequivocally states that "[t]he contractor *shall achieve* the admission and procedure objectives" that it has negotiated with the Health Care Financing Administration. J.A. at 959 (emphasis added). I fail to see, then, how the majority can conclude that HHS "will put no stock in the absolute reduction of given medical procedures as a criterion for renewal of PRO contracts." Maj. op. at 1056. The medicare law *requires* that a PRO's performance "will be judged" against these objectives. 42 U.S.C. § 1320c–2(c)(7) (1982). HHS would be derelict in its duties if it "put no stock" in a PRO's compliance.

### B.

Since numerical objectives are thus intended to have a significant effect on reimbursements, the crucial question is whether they may sometimes prove too effective. A PRO, knowing it will be measured against such firm benchmarks, may—unconsciously or otherwise—deny reimbursement for some "medically necessary" services, in order to meet its objectives. I believe this result is entirely plausible. And, if reimbursements are in fact denied for eligible services, hospitals will be among the affected parties.

The fact that numerical objectives may have this type of impact on hospitals and other parties strongly suggests that the objectives require notice and comment, *see Batterton v. Marshall,* 648 F.2d 694, 708 (D.C.Cir.1980), although it does not compel that conclusion. *Cf. American Postal Workers Union v. United States Postal Service,* 707 F.2d 548, 560 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). As the *Batterton* court stated, "[t]he critical question is whether the agency action jeopardizes the rights and interests of parties, for if it does, it must be subject to public comment prior to taking effect." 648 F.2d at 708 (footnote omitted). Specifically, the *Batterton* court held that a new method of calculating unemployment statistics was not a "policy statement," or otherwise exempt from notice and comment, because "recipients of CETA emergency job program monies [were] subject to a new method for determining ... allocation[s]." *Id.* In other words, statutory entitlements were affected by the agency action.

In addition to their possible impact on medicare entitlements, the numerical objec-

tives have been negotiated pursuant to an explicit legislative directive. This is another crucial factor that suggests agency action is a substantive rule rather than a statement of policy. *American Postal Workers, supra,* at 558.

The majority tries to sidestep these factors—reciting, for example, that "the real dividing line between regulations and general statements of policy is publication in the Code of Federal Regulations." Maj. op. at 1056. But this claim is just another way of deferring to HHS' own views. Obviously, an agency that contends its rule is not substantive is unlikely to publish that rule in the CFR. This fact, however, adds nothing to the underlying contention. If the agency's action is in reality a substantive rule, it is no less so for remaining unpublished.

It is conceivable, of course, that all of the medical services targeted for nonreimbursement under the numerical objectives will, in fact, qualify as "unnecessary." In other words, the numerical objectives in PRO contracts may simply strengthen enforcement of the statutory standard that already specifies which medical services should not be reimbursed. But, there are strong reasons for doubting that the impact of numerical objectives will be so confined. These doubts are fed by Congress' clear intent to reduce medicare costs, by the competitive bidding process that generates the numerical objectives, by the ultimate use of those objectives to judge PRO performance when contracts are renewed, by the malleable character of the "medically necessary" reimbursement standard, and by the fact that a PRO's application of that standard to medicare claims will usually be final. *See* 42 U.S.C. § 1320c–3(a)(2) (1982). Thus, the numerical objectives may well reduce the level of reimbursements below what the statute intends. I conclude that the affected hospitals are entitled to participate in the formulation of the numerical objectives.

This conclusion is supported by a recent decision by the Ninth Circuit that very closely resembles the case before us. In *W.C. v. Bowen,* 807 F.2d 1502 (9th Cir.

1987), the court confronted a regulation that affected the plaintiffs in the same indirect but palpable way that the PRO objectives affect hospitals. *W.C.* involved Congress' new policy of having the Social Security Administration (SSA) review administrative law judge decisions granting disability benefits. Unable to review all such benefits awards, the SSA promulgated a regulation limiting its review to those awards made by ALJs who granted seventy percent or more of the disability claims they adjudicated.

The *W.C.* trial court found, and the Ninth Circuit agreed, that the regulation that targeted review was substantive and therefore subject to notice and comment requirements of the APA. The Ninth Circuit noted that the regulation not only changed existing policy but was also promulgated pursuant to legislative authority in the form of the Bellmon Amendment. That Amendment, reflecting Congress' concern about rising disability payments, directed the Secretary of Health and Human Services to begin reviewing ALJ decisions "on his own motion."

The parallel between the facts in *W.C.* and in the case before this court is striking. The Bellmon Amendment intensified the scrutiny of disability claims without altering the standards by which those reviews would be conducted. The numerical objectives for PRO review of hospital reimbursement claims serve the same cost-cutting function in the same manner. In *W.C.,* even though the standards remained unchanged, the court concluded that "[t]he review program affects existing rights" in part because "it was *designed* to alter ALJ decisions." *Id.* at 1505 (emphasis added). As the Ninth Circuit thus recognized, where there is strong congressional intent to reduce benefits payments, there is a concomitant risk of overshooting the mark. Because the numerical objectives in the present case are similarly *designed* to reduce hospital reimbursements, we should provide the same buffer against "overshooting" by permitting notice and comment.

## C.

The majority's attempt to distinguish *W.C.* is unpersuasive and, not surprisingly, relegated to a closing footnote. The footnote argues that this case differs from *W.C.* in two "profound" respects. First, the majority says "there has been no finding that HHS' objectives have in fact caused, *sub rosa*, a shift in the underlying substantive standard of Medicare review." Maj. op. at 1057 n. 4. It is true that the court rulings in *W.C.* occurred long enough after the Bellmon regulation was promulgated that the courts could take judicial notice of a decline in actual disability awards. But nowhere did the opinions indicate that this factual finding was essential to the holding. On the contrary, both the district and circuit courts in *W.C.* relied on the fact that the *intent* of the Bellmon program was to reduce disability awards. *W.C. v. Heckler*, 629 F.Supp. 791, 798 (W.D.Wash.1985) ("the Bellmon Review Program was not a procedural rule because the ultimate purpose of the program was to change the outcome of agency decisions"); *W.C. v. Bowen*, 807 F.2d at 1505 (to same effect).

This court, of course, has no data before it to gauge the success of the PRO objectives in reducing medicare reimbursements. This cannot be determinative, however, of the objectives' rulemaking status. The majority's approach means that, even when an agency action otherwise possesses the attributes of a substantive rule, the court must wait to determine its true impact before deciding whether notice and comment should have been accorded at the outset. "In an ideal world," the majority rationalizes, "one could ascertain at the outset the need for notice and comment." Maj. op. at 1056. By resigning itself to an imperfect world, the majority misses the real issue. Granted that our foresight is not ideal, the key question is how the risks of our imperfect vision should be allocated. I believe that doubts about a rule's future impact should be resolved in favor of participatory rulemaking. The majority is content, instead, to make plaintiffs wait out "the actual workings of the regulation." Maj. op. at 1056.

Delaying the determination that a rule is substantive allows a rule to establish itself as the norm, only to be thrown out later as improperly formulated. This is unfair to affected parties and disrupts orderly government. Such an approach also runs counter to the very purpose of notice and comment, which is to assure that the correct rules are established in the first instance. As this court has explained, "public participation assures that the agency will have before it the facts and information relevant to a particular administrative problem ... [and] increase[s] the likelihood of administrative responsiveness to the needs and concerns of those affected." *Guardian Federal Savings & Loan v. FSLIC*, 589 F.2d 658, 662 (D.C.Cir.1978).

The majority offers one other ground for distinguishing *W.C.* from this case. In *W.C.*, we are told, the Social Security Administration imposed a "tough new substantive barrier" between claimants and their disability awards. Maj. op. at 1057 n. 4. Notwithstanding the majority's forceful adjectives, the "barriers" imposed in these two cases are really quite similar. In *W.C.*, Congress created a new program for reviewing disability claims. So, too, in this case, Congress replaced the former system of professional standards review organizations with tougher watchdogs: the new PROs. In *W.C.*, the agency went beyond the statute's requirement of heightened review, targeting the disability decisions of particular ALJs. So, too, in this case, HHS went beyond the statute's simple requirement of "negotiated objectives," establishing numerical goals for reducing particular categories of medical services that HHS devised on its own.

In short, these two cases overflow with similarities rather than differences. And, in each case, participatory rulemaking is warranted because "the purpose of § 553 is 'to enable[ ] the agency promulgating the rule to educate itself before establishing ... procedures which have a substantial impact on those regulated.'" *National Tour Brokers Ass'n v. United States*, 591 F.2d 896, 902 (D.C.Cir.1978) (footnote omit-

ted). By denying notice and comment, we defeat that process. The impact of the type of "policy" statement HHS has issued in this case can numb the ability of regulated institutions to challenge the agency's policy decision. If an agency never needs to hear from its constituency, it can fail to carry out its statutory mission and never become the wiser. I would hold that the numerical objectives contained in PRO contracts should be subject to notice and comment, at least with respect to the hospitals located within a PRO's jurisdiction.